NORMAN D. GODBOLD, JR., AS INSURANCE COMMISSIONER OF THE TERRITORY OF HAWAII, *v.* GONZALO MANIBOG, AS PRESIDENT OF THE FILIPINO AID ASSOCIATION.

No. 2504.

SUBMITTED JULY 2, 1942.          DECIDED AUGUST 5, 1942.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY KEMP, C. J.

This is an appeal by Norman D. Godbold, Jr., as insurance commissioner of the Territory of Hawaii (hereinafter referred to as "petitioner" or "commissioner," as the context requires) from a decree in equity. The proceeding in which said decree was rendered was instituted by petitioner against Gonzalo Manibog (hereinafter referred to as "respondent") as president of the Filipino Aid Association (hereinafter referred to as "the association"), a voluntary association duly registered and licensed as a mutual benefit society. This suit was instituted for the purpose of having a receiver appointed for the association under the provisions of Act 209 of the Session Laws of Hawaii 1939 (Series D-164) relating to mutual and fraternal benefit societies.

Petitioner alleged *inter alia* that on the 10th day of May, 1941, he ordered an examination into the affairs of the association as of April 30, 1941; that said examination revealed assets of $134,235.18 and that the paid-in dues or contributions of the members of the association in good standing amounted to $322,874.50; that the equity of the said members is in danger of being further reduced if said association is permitted to continue in business; that the constitution and by-laws of the association as amended and adopted February 1, 1941 (Exhibit "A" attached to the petition), require the association, under certain conditions, to pay to its members stated amounts of money as "Going Home Benefits"; that said examination revealed that the association is unable and will continue to be unable to meet its benefit obligations required by its by-laws;

that applications for benefit payments made in October, 1938, and thereafter, have not been paid; that the successful and continued operation of the association is dependent upon dues and contributions from new members; that no new members have joined the association for a period of sixteen months prior to April 30, 1941; that there are 1272 members of the association holding 2467 memberships (the by-laws permit double memberships); that 850 of said members, representing 1783 memberships, have filed applications for "Going Home Benefits"; that the dues or contributions paid in by said applicants aggregate $254,-075; that to pay said applicants their going-home benefits at the rates set forth in the by-laws would require $693,965, a sum in excess of that already paid in by all members; that said amount is beyond the ability of the members of the association to pay; that under the by-laws a member may request and be granted a refund of two-thirds of the amount paid in by him; that to make refunds to all members on that basis would require $215,249, a sum in excess of available assets; that under the by-laws the secretary-treasurer is required to receive all contributions of members and deposit same in a bank for payment of benefits and expenses; that the president, and not the secretary-treasurer, receives all such contributions and that such contributions are not deposited in a bank but are retained as cash on hand; that the by-laws require that applications for going-home benefits shall be stamped with or have endorsed thereon the date and hour of their receipt and that such applications were not stamped or endorsed, as required; that the by-laws require that applications for going-home benefits be considered and approved or disapproved by the board of directors in the order of their receipt; that the board of directors has taken no action on such applications; that the president, wholly without authority, has acted on such applications and has deter-

mined which should be approved or disapproved; that said examination revealed a shortage of $1054.20 in the cash on hand on April 30, 1941; that funds of the association were, wholly without authority, used by the president for other than the uses of the association; that prior to January 14, 1941, applications for benefits had not been entered in a public record of the association; that a demand was made upon the association by letter dated January 14, 1941 (Exhibit "B"), to correct the foregoing and other irregularities within thirty days and that the association has refused and neglected to comply with said demand; that prior to said 14th day of January, 1941, vouchers supporting expenses and disbursements were not all on hand; that demand to correct such irregularity was made by letter (Exhibit "B") but said association has refused and neglected to comply with said demand.

After setting forth the facts of which the foregoing is the substance the petition proceeds as follows: "XIV That from the foregoing and upon the examination of the books, papers, affairs and conditions of said Association, the petitioner has ascertained, found and determined that irregularities have been practiced by the officers and directors of said Association; that the assets of said Association have been impaired; that said Association has been conducting its affairs in an unsafe and unauthorized manner so that the continuance of its business would be hazardous to the public; and that it is necessary for the protection of the interests of the members of said Association and of the public that a receiver be appointed for said Association. XV That under and by authority of the provisions of section 6852-I of chapter 224, Revised Laws of Hawaii, 1935, as amended, your petitioner, on or about the 16th day of July, 1941, closed the doors of said Association and took charge of the books, assets and affairs of said Association, pending the appointment of a receiver for said Association,

for the protection of the interests of the members of said Association and of the public."

The answer of the respondent admitted the truth of many of the allegations of the petition and alleged that because of the seizure of the books and records of the association he was unable to either admit or deny the truth of the allegations as to the value of the assets of the association or the amount of dues paid in by its members. However, at the trial it was stipulated that for the purpose of the trial the value of the assets of the association and the amount of dues paid in by the members were correctly alleged in the petition. In view of the findings of fact by the circuit judge, as distinguished from his conclusions of law, which findings are apparently accepted by both parties as being supported by the evidence, admissions and stipulations, we do not deem it necessary at this point to further state the contents of the answer, stipulations or evidence.

In his decision the circuit judge made extensive findings of fact in substantial accord with petitioner's allegations, which he stated "disclose that I am in accord with Petitioner's contention that the financial plan under which this Association operates is inherently and patently unsound." He also stated that "Associations such as this should be regulated and compelled by law to either operate under a sound financial plan or be dissolved," and that "The 1939 Legislature appears to have had such in mind," citing the 1939 House Journal, page 619. After noticing that under the law in 1937, when this association was first registered, the commissioner was required to register an association, if its objects were lawful, the conclusion was reached that the 1939 amendment (Act 209) additionally required the commissioner to pass upon the soundness of the organization's financial plan (§ 6852-A) and also required an existing and registered association to qualify itself in conformity with the provisions of said Act within

six months after the passage of Act 209, failing which its right to operate would cease. (§ 6852-F.) Section 6852-F of said Act 209 of the Session Laws of 1939 was interpreted as giving the commissioner the power and authority to deny existing associations, when attempting to qualify, authority to continue business if upon due investigation he found the association's financial plan unsound.

The conclusion was reached that because the commissioner in 1939 permitted the association to qualify under the Act when its financial plan was unsound and still later, in February, 1941, accepted and filed amended by-laws containing a provision which rendered the financial plan still more unsound, thereby neglecting two opportunities to protect directly the public interest by permitting the association to continue operating under a flagrantly unsound financial setup, he cannot now be heard in equity to argue that as the association's financial plan is unsound a receiver must be appointed to protect the public interest. It was further concluded that the interests of the members could not be so protected for the additional reason that, as held in *Martinez* v. *Parado,* 35 Haw. 149, 153, the by-laws of an unincorporated association, if not immoral, contrary to public policy or the law of the land, or unreasonable, constitute a contract between the members which the courts will enforce. In discussing this phase of the case the circuit judge expressed the opinion that the scheme of the organization of the association is a "snare and a delusion"; that a person would be unwise to join the association as it is now set up and operated and would be prudent in withdrawing in the manner prescribed by the 1941 amendment of the by-laws, which requires a refund of two-thirds of the contributions paid by a member applying therefor.

The final conclusion on this phase of the case was that the petitioner under the facts was not justified in invok-

ing against the association section 6852-I of Act 209, and that no grounds, based upon the defects in the financial plan of the association, presently exist for the appointment of a receiver. Section 6852-I referred to provides: "If upon the examination of any such society, it is found to be insolvent, or if it is deemed necessary by the commissioner for the protection of the interests of its members or the public, the commissioner may at once close the doors of the society without any notice whatsoever, and take charge of the books, assets and affairs of the society until the appointment of a receiver as provided by law."

We first observe that the case of *Martinez* v. *Parado*, *supra*, relied upon by the circuit judge, arose under the statute in force prior to the 1939 amendment, which for the first time subjected the activities of a mutual benefit society (other than its offer of death, sick or disability benefits) to governmental regulation. The 1939 amendment made it quite clear that the protection theretofore given by governmental regulation to the contracts of members for death, sick and disability benefits was to be extended to such contracts for all other benefits offered by such an association. In other words, the statement in the opinion of this court in the cited case to the effect that "if the society in question offered only going-home benefits it would not be subject to the provisions of the regulatory Act in question," is no longer the law, since the 1939 amendment makes mutual benefit societies offering to pay death, sick, disability, or "other benefits" subject to all of the provisions of the Act. Moreover, *Martinez* v. *Parado* involved a by-law provision designed to protect the funds collected to provide going-home benefits from unauthorized withdrawals by obligating members who apply for and receive a going-home benefit to use it for that purpose or refund it. On the whole, we are unable to see how the holding in that case can have any bearing on the right of

the commissioner to exercise the powers and duties conferred and imposed upon him by the statute under which he purported to act in this case. Consequently, unless the circuit judge was right in ruling that the commissioner was estopped by twice passing up an opportunity to disapprove the association's plan of operation, the unsoundness of which was alleged and proved by the petitioner and found by the circuit judge, the recited facts would seem to justify the determination of the commissioner that it is necessary for the protection of the interests of the members that a receiver be appointed for said association and to justify him in proceeding as he did for the purpose of having such receiver appointed.

The respondent admits that an estoppel cannot be invoked against the commissioner by reason of his conduct when the association qualified in 1939, because, as he argues, the commissioner had no authority to pass upon the financial plan of an association organized prior to the passage of Act 209; that such authority as was given him in that regard was confined to associations thereafter organized. It is argued that by Act 209 the legislature inferentially, at least, has said to the commissioner, "You may prohibit a new society from doing business if you find that the plan of such a new society is unsound from an actuarial or accounting standpoint but you cannot prevent any existing society from doing business for that reason." It is argued, however, that the commissioner did have authority to pass upon the financial plan when in February, 1941, the amended by-laws were presented to and filed by him and that he, having failed to then act, is thereby estopped from setting up as a ground for a receivership the unsoundness of the financial plan disclosed by the examination in May, 1941, the unsoundness being attributable to the provisions of said by-laws. In support of the contention that the legislature did not intend to empower

the commissioner to move against prior existing associations because of the unsoundness of their financial plan, reference is made to a committee report in the 1939 House Journal 619, 620, where the committee said, *inter alia,* that "Certain Filipino societies provide for a benefit which they call a 'going home benefit' and whenever any one of their members wishes to leave Hawaii for Manila, the members is supposed to get several hundred dollars for his expenses and as a sort of bonus. It is obvious in reading the articles of association of this type of society, that the money obligated to be paid would exceed by some ten to twenty times the entire amount that could ever possibly be collected."

We are unable to agree with the conclusion of the circuit judge that the commissioner is estopped from proceeding against the respondent on the ground that its financial plan is unsound.

The circuit judge did not expressly say that the commissioner was estopped from proceeding as he did. What he did say was that having passed up two opportunities to protect the public interest and having permitted the association to continue operating under a flagrantly unsound financial setup, the commissioner cannot now be heard in equity to argue that as the association's financial plan is unsound a receiver must be appointed to protect the public interest. Both counsel have, and we think correctly, treated the holding as an application of the doctrine of equitable estoppel. Apparently both court and counsel have overlooked the familiar principle of estoppel that a sovereign state is not subject to an estoppel to the same extent as an individual or a private corporation. "The doctrine of estoppel is not applied to the extent of impairing sovereign powers of a state such as it exercises, for example, in the enactment and enforcement of police measures. A state cannot be estopped by the unauthorized

acts or representations of its officers." 19 Am. Jur. § 166, p. 818, and cases cited. "Police measures" as used in the foregoing authority undoubtedly refers to that function of government more commonly referred to as police power. Police power has a very wide and varied meaning. A short, concise definition of that term is, "Police power is the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society." 12 C. J. § 412, p. 904. Without pursuing the subject further, we think it can be said that to apply the doctrine of estoppel to the commissioner in this case would be equivalent to applying it to the Territory for whom he acted and that he was acting in the performance of a duty imposed upon him by the legislature, within the police power of the Territory. The doctrine of estoppel cannot therefore be invoked against him.

Neither can we agree with the argument of the respondent that the legislature has by the 1939 Act required the commissioner to permit the continued operation of pre-existing associations under unsound financial plans.

Section 6852-C of Act 209 requires each society to file with the commissioner annual statements containing information designed to disclose the resources and liabilities of such society and further provides that: "The powers, authorities and duties relating to examinations vested in and imposed upon the insurance commissioner under the provisions of chapter 224 of the Revised Laws of Hawaii 1935, are hereby extended to and imposed upon the insurance commissioner in respect to examinations of such societies." Section 6815 of said chapter 224 provides that the commissioner shall annually and may oftener visit each domestic insurance company and society and make a detailed examination into the affairs and conditions of the company or society. It thus became the duty of the com-

missioner to visit the society here involved at least annually and make a detailed examination into its condition and affairs. He made such a visit and examination in May, 1941, and then discovered a condition so unsound that he deemed it necessary for the protection of the interests of the members to at once close the doors of the society, without notice, and take charge of the books, assets and affairs of the society pending the appointment of a receiver as provided in the section of the statute under which he acted. The provisions of the statute imposing on the commissioner the duty to visit and examine such societies and to take action if, upon the examination, he deems it necessary for the protection of the interests of the members or the public, clearly apply to all such societies regardless of when they were organized. It cannot, therefore, be successfully maintained that the legislature has differentiated between old and new societies in prescribing the powers and duties of the commissioner to regulate the affairs of such societies. If, then, the legislation under which the commissioner acted did not go beyond the constitutional limits, his action must be sustained.

The respondent has raised the question of the constitutionality of sections 6852-H and 6852-I of Act 209, the sections authorizing the commissioner to apply for the appointment of a receiver if, upon the examination authorized by section 6852-C, he shall ascertain and find certain facts to exist. The argument is that the statute violates the due process clause of the Constitution in that the legislature has attempted to delegate to the commissioner the dictatorial power to decide a question which is vital to the continued existence of the society without laying down any rules which would guide him in the exercise of that power and without laying down any rules which would guide the association along a course of conduct which would prevent such arbitrary action by the commissioner.

The commissioner having stated in his bill that under and by authority of the provisions of section 6852-I of chapter 224, Revised Laws of Hawaii 1935, as amended, he closed the doors of said association and took charge of the books, assets and affairs of said association pending the appointment of a receiver of said association, for the protection of the interests of the members of said association and of the public, the argument has placed special emphasis on that section. We think, however, that sections 6852-H and 6852-I supplement each other and that the pleadings, evidence and decision demonstrate that the commissioner relied upon section 6852-I only for his authority to act without notice and that the notice to correct irregularities which he gave in January, 1941, was given under section 6852-H. We must, therefore, consider the whole Act and particularly the two sections dealing with the authority of the commissioner to proceed against an association for the appointment of a receiver in passing upon the constitutional question raised.

It requires no citation of authorities to establish that if a law is susceptible of two constructions, one of which would render it constitutional and the other unconstitutional, the one rendering it constitutional will be adopted.

Section 6852-H is replete with criteria or rules to be applied by the commissioner to determine whether or not it is necessary for him to act for the protection of the interests of the members or the public. If, upon the examination of such a society or otherwise the commissioner ascertains and finds that the laws of the Territory relating to such society are not being fully observed, or if he finds that any irregularities are being practiced, or that such society is conducting its affairs in an unlawful or unauthorized manner, that is, in violation of its constitution and by-laws, or in violation of the statute, he is then authorized to determine whether or not by reason thereof

it is necessary for him to act in accordance with the provisions of section 6852-I and close the doors of the society, without notice, and apply for the appointment of a receiver. We think that the pleadings, evidence and findings show that the commissioner reached the conclusion that it was necessary for him to act as he did, and as section 6852-I authorizes him to act, by applying the criteria or rules prescribed by section 6852-H.

That the commissioner was justified in finding as a fact that the affairs of the society in question were being conducted in an unsafe and unauthorized manner hardly admits of argument. In addition to the irregularities pointed out in his letter of January 14, 1941, the pleadings, evidence and findings disclose other unauthorized acts, some of which have not been mentioned but which show greater disregard for the provisions of the constitution and by-laws than those mentioned, as, for instance, the pleadings, evidence and findings show that 850 members who have applied for going-home benefits hold 1783 memberships, whereas the constitution and by-laws permit members to hold only double memberships. The mere recital of these facts shows that certain members hold more than two memberships and at least one of the applying members endorsed upon his application the fact that he held a triple membership.

It seems quite clear that the commissioner was not compelled to rely solely upon the facts disclosed by an examination of the society for the statute provides that if, upon examination "or otherwise" he shall ascertain certain facts, he is then authorized to act.

The conclusion that the statute does not violate the due process clause is supported by the following authorities: *Field* v. *Clark,* 143 U. S. 649; *Red "C" Oil Co.* v. *North Carolina,* 222 U. S. 380; *Moers* v. *City of Reading,* 21 Pa. 188.

The decree appealed from is reversed and the cause remanded for further proceedings consistent with this opinion.

*J. V. Hodgson,* Attorney General and *W. D. Ackerman, Jr.,* Deputy Attorney General, for the appellant.

*H. Irwin* for respondent.