CAROLYN K. CUDAL, Appellant-Appellee, *v.* FRANKLIN SUNN, Director, Department of Social Services and Housing, State of Hawaii, Appellee-Appellant

NO. 11818

(CIV. NO. 85-3847)

SEPTEMBER 8, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Is the Department of Social Services and Housing (DSSH or the department) of the State of Hawaii barred from recovering sums overpaid to recipients of benefits under the Aid to Families with Dependent Children (AFDC) and the Food Stamp programs by its failure to act promptly in attempting to recoup overpayments as required by the relevant federal regulations? The Circuit Court of

the First Circuit held the pertinent regulation prevented a recovery of AFDC overpayments and "[t]he failure of the Department to take [prompt] action . . . constitute[d] affirmative misconduct" equitably estopping the State from recovering any overpayments. We conclude from a review of the governing statutory scheme that the regulation prescribing the period within which action to recover AFDC overpayments must be commenced is directory despite its mandatory wording and that the State is not equitably estopped from recovering amounts overissued in food stamp vouchers. Thus, we reverse the circuit court's ruling.

## I.

Ms. Carolyn Cudal and her minor daughter, who initially were considered members of their own household for benefit purposes, received AFDC payments and food stamps throughout 1984. They moved in with Ms. Cudal's parents on September 9, 1984, which made them ineligible for public assistance as a separate household. Ms. Cudal suspected that living with her parents could result in a reduction of benefit payments for herself and her daughter. She therefore apprised the department of the change in her housing situation, going so far as to hand deliver a letter from her mother verifying the move, along with receipts of mortgage payments made by her parents and utility bills paid by them. Hence, as the circuit court found, "[a]s of September 14, 1984, [the department] was on notice of the change in [the benefit recipient's] living circumstances." Finding of Fact No. 3.

Yet DSSH made no effort to promptly adjust the benefits or recoup the overpayments. More than a month passed before Ms. Cudal was asked to submit additional information to enable a recomputation of benefits. And it was not until January 18, 1985, when she met with a social worker for a required semi-annual eligibility review, that Ms. Cudal was informed she would no longer receive food stamps. But she was assured by the social worker that the AFDC payments would not be affected by the change in circumstances.

DSSH served Ms. Cudal with a Notice of Expiration of Food Stamps on January 25, 1985. It nevertheless sent her food stamp vouchers in February and March, which were returned promptly.

The department finally stopped sending Ms. Cudal vouchers in April. And on May 3, 1985, despite the social worker's assurance that AFDC payments would not be diminished, Ms. Cudal was informed that there had been overpayments in AFDC benefits for her daughter and herself. The Overpayment and Repayment Action Notice stated they had been paid $210.00 more in AFDC benefits and $709.00 more in food stamps than they were eligible to receive. An amended notice restating the amount of overpaid AFDC benefits as $245.00 was sent later to Ms. Cudal.

Ms. Cudal signified her intent to contest the recovery of the allegedly excessive payments by filing a Request for Fair Hearing, recounting therein her timely efforts to apprise DSSH of the change in her situation and the department's inaction. It failed, she asserted, "to adjust the benefits *promptly* as is required" by federal regulations, and its tardy action "estopped [it] from seeking recoupment of the overpayment." But in the opinion of the Fair Hearing Officer, "[d]espite the litany of inaction by the Department to adjust the claimant's financial and food stamp benefits, there [was] no basis to dismiss the overpayment and overissuance." She also ordered "[t]he Department [to] recalculate the financial overpayment to include verified utility costs and [to] properly claim and recover the financial overpayment pursuant to Administrative Rule §17-626-17."[1]

Ms. Cudal sought judicial review of the unfavorable decision, reiterating the grounds for reversal urged in the administrative

[1] The department's Administrative Rule § 17-626-17 (amended April 20, 1985), in relevant part, reads:

*Overpayments.* (a) An overpayment made to individuals of an assistance unit receiving financial assistance, including overpayment resulting from aid paid pending hearing decisions, shall be recovered by reducing the amount of any future financial assistance payable to the assistance unit.

(1) Any cash refunds made by an individual of the assistance unit shall be collected and computed in the total overpayment;
(2) The amount of the monthly financial assistance payment payable to the assistance unit shall be reduced by ten per cent of the family's standard of assistance to recover the overpayment;
(3) The amount of financial assistance payable to an assistance unit from the initial month of application through the month the financial assistance payment is approved shall be reduced in accordance with paragraph (2). The financial assistance payable for the initial month of eligibility shall not be reduced when the financial assistance payment is prorated.

proceeding. But this time, her argument did not fall on deaf ears. In ruling on the matter of AFDC benefits the circuit court concluded: "45 C.F.R. § 233.20(a)(13)(i)(A) mandates that the Department take prompt action to recoup overpayments";[2] "45 C.F.R. § 233.20(a)(13)(i)(E) mandates that the Department recoup an overpayment by the end of the calendar quarter following the calendar quarter in which an overpayment is discovered";[3] and

---

[2] 45 C.F.R. § 233.20(a)(13)(i)(A) provides:

(A) The State must take all reasonable steps necessary to promptly correct any overpayment.

(1) Any recovery of an overpayment to a current assistance unit, including a current assistance unit or recipient whose overpayment occurred during a prior period of eligibility, must be recovered through repayment (in part or in full) by the individual responsible for the overpayment or recovering the overpayment by reducing the amount of any aid payable to the assistance unit of which he or she is a member, or both.

(2) If recovery is made from the grant, such recovery shall result in the assistance unit retaining, for any payment month, from the combined aid, income and liquid resources, . . . not less than 90 percent of the amount payable under the State plan to a family of the same composition with no other income. Where a State chooses to recover at a rate less than the maximum, it must recover promptly.

The statutory authority for the foregoing is found in 42 U.S.C. § 602(a)(22), which in relevant part reads:

A State plan for aid and services to needy families with children must —

.    .    .    .

(22) provide that the State agency will promptly take all necessary steps to correct any overpayment or underpayment of aid under the State plan, and, in the case of —

(A) an overpayment to an individual who is a current recipient of such aid (including a current recipient whose overpayment occurred during a prior period of eligibility), recovery will be made by repayment by the individual or by reducing the amount of any future aid payable to the family of which he is a member, except that such recovery shall not result in the reduction of aid payable for any month, such that the aid, when added to such family's liquid resources and to its income . . . , is less than 90 percent of the amount payable under the State plan to a family of the same composition with no other income (and, in the case of an individual to whom no payment is made for a month solely by reason of recovery of an overpayment, such individual shall be deemed to be a recipient of aid for such month)[.]

[3] 45 C.F.R. § 233.20(a)(13)(i)(E) sets the standard for "prompt recovery"; it reads:

(E) Prompt recovery of an overpayment: A State must take one of the following three actions by the end of the quarter following the quarter in which the overpayment is first identified:

"[t]he Department's failure to initiate recoupment within the period prescribed by [the latter provision] bars [it] from any further attempts at recoupment of the financial assistance overpayment." The court further concluded "[t]he failure of the Department to take any action to recoup [the] financial and food stamps overpayments for more than eight months after [the Cudals'] change in living circumstances was first reported constitutes affirmative misconduct" which "estopped [it] from recoupment of any portion of [the] financial or food stamps overpayments." The department now turns to this court, seeking to reinstate the administrative decision that recovery of the overpaid benefits is not foreclosed.

## II.

"When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states." *Rosado v. Wyman,* 397 U.S. 397, 423 (1970) (quoting *Helvering v. Davis,* 301 U.S. 619, 645 (1937) ). We therefore begin our analysis of the issues posed on appeal with an overview of the AFDC program.

### A.

The program was "established by Title IV of the Social Security Act, 42 U.S.C. §§ 601-613, and 'designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them[.]' *Shea v. Vialpando,* 416 U.S. 251, 253 (1974)." *Montalvo v. Chang,* 64 Haw. 345, 348, 641 P.2d 1321, 1324 (1982). "It is financed in large measure by the Federal Government on a matching-fund basis, and participating States must submit AFDC plans in conformity with the Act and the regulations promulgated thereunder by the Department of Health, Education, and Welfare (HEW) [now the Department of Health and Human Services]." *Shea v. Vialpando,* 416 U.S. at 253. Although the State is

---

(1) Recover the overpayment, (2) initiate action to locate and/or recover the overpayment from a former recipient, or (3) execute a monthly recovery agreement from a current recipient's grant or income/resources.

"given broad discretion in administering the program, non-compliance with federal requirements can result in a cut-off of matching funds." *Montalvo v. Chang,* 64 Haw. at 348, 641 P.2d at 1324 (citing *Rosado v. Wyman,* 397 U.S. at 420-23).

The federal requirements relating to the recovery of AFDC benefits paid in error are stated in the Code of Federal Regulations at 45 C.F.R. §§ 233.20(a)(13)(i)(A) and 233.20(a)(13)(i)(E). In order to comply with the relevant federal standard, "[t]he State must take all reasonable steps necessary to promptly correct any overpayment." *See supra* note 2. And the State must either "[r]ecover the overpayment," "initiate action to locate and/or recover the overpayment," or "execute a monthly recovery agreement" before "the end of the [calendar] quarter following [that] in which the overpayment is first identified." *See supra* note 3.[4]

### B.

The department acknowledges a failure "to initiate action to recoup by the end of the [crucial] quarter." It recognizes the foregoing federal regulations are couched in mandatory terms. Yet it would have us reinstate the administrative decision because "federal law does not bar recoupment [of the AFDC benefits overpaid] in this case; in fact, [the law] requires it." We would have to agree.

---

[4] 45 C.F.R. § 233.20(a)(13)(i)(E) was tracked substantially by its State counterpart, Administrative Rule § 17-626-17. The original State rule, which took effect on July 19, 1982, in pertinent part, read:

*Overpayments.* (a) When the department discovers that an overpayment has occurred, the department shall take one of the following actions by the end of the quarter ending on March 31, June 30, September 30, or December 31 following the quarter ending March 31, June 30, September 30, or December 31 in which the overpayment was discovered:

(1) Recover the total overpayment;
(2) Initiate action to locate or to recover the overpayment from a former recipient; or
(3) Initiate recovery from a current recipient's monthly financial assistance payment, liquid assets, or income.

However, these provisions were repealed on December 5, 1983. The current version of the rule does not contain the time provision which was in the original. *See supra* note 1.

Granted, "[i]t is difficult to conceive of anything more absolute than a time limitation." 2A *Sutherland on Statutory Construction* § 57.19, at 682 (C. Sands 4th ed. 1984). Yet courts "do not always [give] mandatory effect to procedural provisions, though the . . . language . . . may be obligatory in form." *Perry v. Planning Commission,* 62 Haw. 666, 675-76, 619 P.2d 95, 102 (1980). "Seemingly absolute time periods for administrative action . . . are often considered mere guides for the conduct of business with dispatch and for orderly procedure." *Id.* at 676, 619 P.2d at 103 (citations omitted). Generally, they are "characterized as directory, unless time is of the essence of the act required, the [governing] statute contains negative language denying the exercise of authority beyond the period prescribed for action, or a disregard of the relevant provision would injuriously affect public interests or private rights." *Id.* (citations omitted). *See also* 2A *Sutherland on Statutory Construction, supra,* at 682-84.

The regulation prescribing administrative action to recover overpayments "by the end of the quarter following the quarter in which the overpayment is first identified" was promulgated to implement a provision of the Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357 (1981).[5] Prior to the passage of the Act, "[t]here [were] no provisions . . . specifying how States [were] to treat overpayments and underpayments [of AFDC benefits]. In practice, States [were] given the option of recouping overpayments, but [were] not required to do so." S. Rep. No. 139, *supra,* at 519, *reprinted in* 1981 U.S. Code Cong. & Admin. News at 785. The major problem, Congress noted, was with overpayments.[6] But

---

[5] The Senate Committee on the Budget, which considered the reconciliation recommendations, expressed the purpose of budget reconciliation in these terms:

Reconciliation is an important tool to restrain Federal spending. It is authorized by Title III of the Congressional Budget and Impoundment Control Act of 1974 (Public Law 93-344). Reconciliation permits the Congress to consider many spending reductions in one bill, while reserving to the individual committees the power to make recommendations for reductions in laws within their respective jurisdictions.

S. Rep. No. 139, 97th Cong., 1st Sess. 2, *reprinted in* 1981 U.S. Code Cong. & Admin. News 396, 397.

[6] The report from the Senate Committee on Finance reads in part:

Although States have been working to improve their administrative procedures and to reduce errors, the committee notes that in the quality control measuring

"[b]y requiring the correction of both overpayments and under-payments, [Congress hoped] that recipients and welfare agencies alike [would] be encouraged to take greater responsibility for assuring the accuracy of [the program's] administration." *Id., reprinted in* 1981 U.S. Code Cong. & Admin. News at 786. The Social Security Act, as amended by the Omnibus Budget Reconciliation Act of 1981, thus mandates a State AFDC plan shall "provide that the State agency will promptly take all necessary steps to correct any overpayment or underpayment of aid under the State plan." *See supra* note 2.

But Congress set no time limit for the recovery or adjustment of overpayments and underpayments. That the regulation in question reflects the congressional will not to have a "statute of limitations" barring the recovery of overpayments is substantiated by the history of the regulation as recorded in the Federal Register. The departmental view reflected there is that "[t]he Act requires correction of 'any' overpayment or underpayment." 47 Fed. Reg. 5671 (1982).[7] Given the general purpose of the Omnibus Budget Reconciliation Act to "restrain Federal spending," *see supra* note 5, the

---

period April-September 1979, 23.5 percent of AFDC cases involved error. The total number of cases involving incorrect payments was 779,100, [sic] Nationally, statistics show that 9.5 percent of funds were overpayments, and 0.9 percent were underpayments. In the 6-month period cited above, a total of $493,979,000 in Federal and State funds were paid to families that were ineligible for assistance or that received payments in excess of the amount payable to them.

S. Rep. No. 139, *supra,* at 519, *reprinted in* 1981 U.S. Code Cong. & Admin. News at 786.

[7] While the regulations now codified in 45 C.F.R. § 233.20(a)(13)(i) were under consideration, "[f]our commenters wrote that there should be some time limit or statute of limitations in adjusting incorrect payments. Two of the commenters wanted to treat underpayments differently than overpayments with respect to time frames and who caused the underpayment." 47 Fed. Reg. 5671.

The recorded response from the Department of Health and Human Services was:

There is no basis in the statute or legislative history for treating overpayments and underpayments differently. Also, the statute requires the correction of all overpayments or underpayments. We do not believe that the statute allows the flexibility to establish time limits. Also we believe that it is cost effective to attempt to recover all overpayments. If at least an attempt is not made to recover an old overpayment, it cannot be determined that the overpayment is not recoverable.

*Id.*

lack of any indication that "time is of the essence of the act[ion] required" or the administrative agency's "exercise of authority beyond the period prescribed for action" has been curtailed, and the fact that a "disregard of the relevant provision would [not] injuriously affect . . . private rights," *Perry v. Planning Commission,* 62 Haw. at 676, 619 P.2d at 102, we can only conclude the regulation in question is directory, though obligatory in form. *Cf. Anderson v. Commissioner of the Department of Human Services,* 489 A.2d 1094, 1099 (Me. 1985) (Requirements in federal statute and in federal and state regulations that agencies administering AFDC program "promptly" take steps to correct overpayments are directory.). It does not absolutely compel action to correct an overpayment within the quarter following that in which the overpayment is first identified and foreclose recovery thereafter.

### III.

We turn from overpayments of direct financial assistance under the AFDC program to the question arising from the overissuance of food stamps. We begin our analysis again with a quick review of the program in question.

### A.

The Food Stamp program was "established in 1964 in an effort to alleviate hunger and malnutrition among the more needy segments of our society." *Department of Agriculture v. Moreno,* 413 U.S. 528, 529 (1973) (citation omitted).[8] Like AFDC, it is largely financed by the Federal Government on a "cost-sharing" basis, *see* 7 U.S.C. § 2025, and the enabling legislation requires "[t]he State agency . . . of each State desiring to participate in the program [to] submit for approval a plan of operation specifying the manner in which such program will be conducted." *Id.* § 2020(d). State compliance thereafter with federal statutory and regulatory directives is enforced, as it is with the AFDC program, by withholding certain matching funds allowed by law. *See id.* §§ 2020(g) and 2025.

---

[8] The statutory foundation for the program is found at 7 U.S.C. §§ 2011-2029.

## B.

Like the related provisions of the Social Security Act, the statute dealing with overissuances of food stamps, 7 U.S.C. § 2022(a)(l), sets no time within which action to establish claims arising from erroneous issuances must be commenced.[9] The implementing federal regulation, however, is by no means silent in this regard.

The pertinent regulation is 7 C.F.R. § 273.18, and the State agency is obligated thereunder to take action to "establish a claim against any household that has received more food stamp benefits than it is entitled to receive."[10] Where "administrative error claims," i.e. claims for overissuance "caused by State agency action or failure to take action," are concerned, the agency is directed to

---

[9] 7 U.S.C. § 2022(a)(1), in pertinent part, provides:

The Secretary [of Agriculture] shall have the power to determine the amount of and settle and adjust any claim and to compromise or deny all or part of any such claim or claims arising under the provisions of this chapter or the regulations issued pursuant to this chapter, including, but not limited to, claims arising from fraudulent and nonfraudulent overissuances to recipients, including the power to waive claims if the Secretary determines that to do so would serve the purposes of this chapter. Such powers with respect to claims against recipients may be delegated by the Secretary to State agencies.

[10] 7 C.F.R. § 273.18 (1986), entitled "Claims against households," in relevant part, reads:

(a) *Establishing claims against households.* The State agency shall establish a claim against any household that has received more food stamp benefits than it is entitled to receive.

. . . .

(2) *Administrative error claims.* A claim shall be handled as an administrative error claim if the overissuance was caused by State agency action or failure to take action.

. . . .

(b) *Criteria for establishing inadvertent household and administrative error claims.* The State agency shall take action to establish a claim against any household that received an overissuance due to an inadvertent household or administrative error if the criteria specified in this paragraph have been met. At a minimum, the State agency shall take action on those claims for which 12 months or less have elasped [sic] between the month an overissuence [sic] occurred and the month the State agency discovered a specific case involving an overissuance. The State agency may choose to take action on those claims for which more than 12 months have elasped [sic]. However, the State agency shall not take action on claims for which more than six years have elasped [sic] between the month an overissuance occurred and the month the State agency discovered a specific case involving an overissuance.

take action on those claims for which 12 months or less have elapsed between the month in which the error occurred and the month when it was discovered. 7 C.F.R. §§ 273.18(a)(2) and 273.18(b); *see supra* note 10. The agency "may choose to take action on those claims for which more than 12 months have [elapsed]," but it "shall not take action on claims for which more than six years have [elapsed] between the month [of] overissuance . . . and the month [of discovery]." 7 C.F.R. § 273.18(b).

Here, the error was discovered and efforts to rectify the error were commenced within five months of the overissuances. And since the regulation states "the State agency shall take action on those claims," *id.,* the inescapable conclusion is that the action was not barred. A ruling that it was would fly in the face of the plain wording of the regulation and only jeopardize the State's receipt of matching funds.

## IV.

The circuit court, however, premised the ruling that foreclosed the establishment of a claim for reimbursement of overissued food stamp vouchers solely on estoppel. The State's inaction, in the court's opinion, "constitute[d] affirmative misconduct" which "estopped [it] from [recouping] any portion of [the] food stamps overpayments."

True, we have "explicitly maintained the validity of the notion that [the] government can be estopped." *Filipo v. Chanq,* 62 Haw. 626, 635, 618 P.2d 295, 300 (1980). But at the same time, we said "the doctrine of estoppel is applicable to prevent manifest injustice to the plaintiff." *Id.* "The fact situation [in *Filipo v. Chang*]," we found, was "clearly necessary for its application." *Id.* The circumstances here do not cry out for an invocation of estoppel against the government as they did in *Filipo v. Chang.*

To begin with, Ms. Cudal suspected there might be a reduction in the assistance she was entitled to when she and her daughter became part of another household. Furthermore, that she was not entitled under the law to receive the vouchers issued to her in error also is not open to doubt. And we could not say the department's failure to act for five months was manifestly unjust for Ms. Cudal when under the federal regulation "[t]he State agency may choose

to take action on those claims for which more than 12 months have [elapsed]." *See supra* note 10. The invocation of estoppel, thus, was clearly erroneous.[11]

The Findings of Fact, Conclusions of Law, and the Order entered by the circuit court on October 31, 1986 are vacated. The case is remanded to the circuit court for entry of an order affirming the decision of the Hearing Officer.

*Thomas D. Farrell,* Deputy Attorney General, for appellee-appellant.

*Kirk Cashmere* (Legal Aid Society of Hawaii) for appellant-appellee.

DISSENTING OPINION OF WAKATSUKI, J.

I respectfully dissent.

In my opinion, the language of 45 C.F.R. § 233.20(a) (13) (i) (E) is of a clearly mandatory nature. The regulation says; "Prompt recovery of an overpayment: A State *must* take one of the following three actions by the end of the quarter following the quarter . . . ." (emphasis added). The plain and natural meaning of this provision is that if the State doesn't take action by the end of the relevant quarter, it is barred from recouping.

I recognize that in certain cases even "[s]eemingly absolute time periods for administrative action [are] considered mere guides for [conduct]." *Perry v. Planning Commission,* 62 Haw. 666, 675, 619 P.2d 95, 103 (1980). As the majority notes, however, such time periods are mandatory if "disregard of the relevant provision would injuriously affect public interests or private rights." *Id.*

Here, Ms. Cudal was in no way responsible for the improper payment. To require her to pay back the benefits she received a significant time ago, and more likely than not already spent, penalizes the innocent and not the offender. Furthermore, such a harsh requirement offends the public's sense of fairness as well. To allow the state to recoup after the deadline is to encourage careless

---

[11] For substantially similar reasons, the circuit court clearly erred in holding the department was estopped from recouping the AFDC overpayments by its failure to seek recovery for eight months.

administration of the AFDC program. More significantly, the burden of properly administering the AFDC program is shifted onto the recipients which is not the intent of this program. In addition, the recipients must now be responsible for the administrator's stale claims of error. Finally, there are other regulations that are designed to protect the recipient from the potentially harsh consequences of recoupment. *See e.g.,* 45 C.F.R. § 233.20(a)(13)(i)(A)(2) (mandating that recoupment not leave the recipient with resources of less than 90% of the minimum monthly entitlement). Equitable administration of the program requires prompt recoupment of overpayments.

The majority is correct in concluding that federal regulations do not bar recoupment of the food stamps in this case. Nevertheless, I believe recovery of the food stamps could be barred by the doctrine of equitable estoppel. The majority's reliance on the fact that Ms. Cudal was not legally entitled to the food stamps and the federal regulation does not prohibit delayed recovery is misplaced. The crucial issue underlying equitable estoppel is whether delayed recoupment of food stamps erroneously given to Ms. Cudal through no fault of her own would create a manifest injustice. *Cf. Filipo v. Chang,* 62 Haw. 626, 618 P.2d 295 (1980). A strong claim of estoppel would exist, for example, if Ms. Cudal had spent the food stamps and recoupment at this time would leave her without means to purchase adequate food. The record before us and the circuit court's findings of fact, however, are not adequate to support such a conclusion. I would therefore remand for further proceedings to resolve the estoppel claim.