955 P.2d 1062

James E. TURNER, Appellant–Appellant,

v.

Susan M. CHANDLER, Director, Department of Human Services, State of Hawai'i, Appellee/Third–Party Plaintiff–Appellee,

v.

Dan GLICKMAN, Secretary, United States Department of Agriculture, Third–Party Defendant–Appellee.

No. 19833.

Intermediate Court of Appeals of Hawai'i.

March 27, 1998.

Tucker A. Dacey, Legal Aid Society of Hawai'i, on the briefs, Kaneohe, for appellant-appellant.

Dorothy Sellers, Deputy Attorney General, State of Hawai'i, on the brief, for appellee/third-party plaintiff-appellee.

Michael Chun, Assistant U.S. Attorney, and Barbara C. Biddle and Peter R. Maier, U.S. Department of Justice, Washington DC, on the brief, for third-party defendant-appellee.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

WATANABE, Judge.

Two primary questions are presented by this appeal: (1) whether the Food Stamp Act of 1977 (the Act), 7 U.S.C. § 2011 et seq., and regulations promulgated by the Secretary to implement the Act, preempt Hawai'i law on equitable estoppel from being applied against the State of Hawai'i (State), Department of Human Services (DHS) in DHS's efforts to recover for overissuances of food stamps; and (2) whether DHS is equitably estopped from recovering the value of food stamps erroneously overpaid to Appellant–Appellant James E. Turner (Appellant) because Appellant applied for food stamps only after being told by a DHS employee that he was eligible to do so.

The Circuit Court of the First Circuit (the circuit court) answered the first question in the affirmative and the second question in the negative. We conclude that the circuit court's answer to the first question was wrong. However, we agree with the circuit court that DHS was not equitably estopped from recovering the value of the food stamp overpayments made to Appellant.

## BACKGROUND

### A. *Facts*

On January 14, 1993, Appellant applied to DHS for medical benefits and general assistance, a form of public financial assistance available to individuals qualified as disabled under Hawai'i law. At the time of his application, Appellant was forty-seven years old and resided with his fifty-five-year-old sister (Sister), Sister's sixty-four-year-old husband, and Sister's children, who at the time were twenty-two and twenty-eight years old. On his initial application, Appellant did not request food stamps because he had been told in the past that he was not eligible to receive them.

It is undisputed that when a DHS caseworker interviewed Appellant on January 28, 1993, the caseworker advised Appellant that "the regulations had changed" and Appellant "was now eligible as a single head of household. to apply for food stamps." Based on the caseworker's advice, Appellant added to his application a request for food stamps. In February 1993, Appellant was certified by DHS to receive food stamps and thereafter received $1,020 in food stamps from February through July 1993.

The application for food stamps was approved based on the caseworker's erroneous documentation that Sister's children were minors. In 1993, the presence of minor children triggered an exception to the regulation that siblings living together are considered one household for food stamp purposes. *See* Hawai'i Administrative Rules § 17–663–2(b); 7 Code of Federal Regulations (CFR) § 273.1(a)(2)(i)(D). However, because Sister's children were adults, the exception did not apply to Appellant. Appellant moved out of Sister's residence at the end of July 1993 and subsequently established eligibility for food stamps as a single-member household. This eligibility entitled Appellant to an additional $69 in food stamps for the month of August 1993.

Appellant's case was subsequently assigned to a different DHS unit, which discovered DHS's error in determining Appellant's eligibility for food stamps. On July 28, 1993, DHS sent Appellant a demand letter, notifying him that he had been overpaid $1,020 in food stamps. DHS also informed Appellant that it had reduced Appellant's overpayment amount by $69, the additional amount which DHS owed him for his August benefits, resulting in a net overpayment owed by Appellant of $951, which DHS sought to recoup.

### B. *Prior Proceedings*

On August 2, 1993, Appellant requested an administrative fair hearing to challenge DHS's recoupment efforts. At the September 2, 1993 hearing, Appellant did not challenge the factual basis for DHS's determination that he had been ineligible for food stamps while he lived with Sister. Instead, he asserted that he should not have to repay the value of the overissuance because he had applied for food stamps based on the erroneous advice of a DHS caseworker. The DHS fair hearing officer conducting the hearing

held that she had no authority to consider Appellant's equity claim:

> [Hearing Officer]: I think what you need to understand though is what I need to look at and I don't have any equity or jurisdiction [sic] here. What I need to look at are the Administrative Rules and I look at them very carefully.... So, for this particular kind of hearing in the food stamp program, I have to also determine whether benefits were paid when you are not entitled to receive them and how is it that they were paid in that particular fashion.... And they are saying it was their fault. Now, I can't take all of those pieces of information and say well obviously no overpayment because it's really not fair that it should happen that way.

In a September 30, 1993 written decision, the hearing officer concluded that Appellant had been overpaid as a result of an agency error and that a claim against Appellant in the amount of $951 had been established. The hearing officer gave Appellant ten days within which to contact DHS and establish his substantive eligibility to receive food stamps. If Appellant chose not to exercise this option, the hearing officer directed DHS to establish a claim against Appellant for the $951 overpayment.

On October 29, 1993, Appellant filed a timely appeal from the hearing officer's decision to the circuit court, naming the DHS Director as the Appellee in the action. On February 9, 1994, the DHS Director filed a third-party complaint against the Secretary of the United States Department of Agriculture (the Secretary), asserting that if Appellant prevailed, the Secretary should be liable for such relief as might be ordered. On February 17, 1994, the Secretary removed the action to the United States District Court for the District of Hawai'i (the federal court), alleging, among other grounds, that the Act and regulations governing overissuances of food stamps preempt Hawai'i case law on equitable estoppel and that federal case law precludes the applicability of an equitable estoppel defense to an overpayment claim.

On September 9, 1994, on Appellant's motion, the federal court entered an order remanding the action to the circuit court. In its order, the federal court specifically rejected the Secretary's preemption argument:

> [T]he Secretary is not being sued for the way he is administering the food stamp program, nor are his regulations being challenged. Neither does this case involve issues of [Appellant's] eligibility to receive food stamps. As one court has stated:
>
> > Although eligibility requirements are strictly governed by federal law, the collection of food stamp overissuances has been broadly delegated to the states. The Secretary of the Department of Agriculture has delegated to the state agencies "the authority to determine the amount of, and settle, adjust, compromise or deny all or part of any claim which results from fraudulent or non-fraudulent overissuances to participating households." 7 C.F.R. 271.4(b). This delegation of authority to the states cuts squarely against the view that the federal act was intended to preempt any and all state law claims that relate to it.
>
> *Vang v. Healy*, 804 F.Supp. 79, 82 (E.D.Cal.1992) (involving, as in the instant case, a plaintiff's assertion that the collection of a food stamp overissuance was barred by the doctrine of equitable estoppel). Although the *Vang* court's analysis centered around an interpretation of 28 U.S.C. § 1441, rather than § 1442(a)(1), this court finds *Vang*'s placement of food stamp overissuance and estoppel issues within the ambit of state, rather than federal law to be relevant to the present case.
>
> * * *
>
> In this case, ... [Appellant] neither alleges that the Secretary acted unlawfully, nor questions the Secretary's authority to oversee the federal food stamp program. Rather, this case involves the application of state law defenses to state agency collection efforts conducted pursuant to powers specifically delegated to the DHS. The fact that the food stamp program is federally funded, or that the Secretary is authorized under the Act to administer the program, is irrelevant to the issue of whether the Secretary has had anything more than an official, titular involvement in this lawsuit. In this court's view, [the Secretary's]

nominal involvement in this case has not created a "significant federal interest" to warrant its removal.

Upon remand, the circuit court affirmed the decision of the DHS hearing officer in an order filed on May 16, 1995. The circuit court found as follows:

1. Federal law preempts the State's law of equitable estoppel in the area of Food Stamp overissuances. Congress or the Secretary of Agriculture did not anticipate that approximately fifty jurisdictions would be authorized to apply their own state law relating to equitable estoppel which would result in the lack of uniformity in applying the Food Stamp Act.

2. In this case, the overpayment was due to an agency error. On the record, the evidence is that Appellant had reason to know of that error. Therefore, even if the State equitable estoppel principle were applied to this case, Appellant would not prevail as a matter of law.

3. There was no reasonable reliance because Appellant had reason to know there was error. The facts which led to that error were peculiarly within the knowledge of the Appellant.

4. Appellant has failed to show that he has suffered substantial detriment. Appellant is not required to pay interest on the amounts owed. Appellant is merely required to repay the amount overpaid, and as the [DHS] has indicated, payment plans are available.

5. Absent a direction from the Secretary of Agriculture to waive the collection, the State is bound to pursue collection efforts.

Based on the foregoing findings, the circuit court concluded "that equitable estoppel does not apply." Accordingly, the circuit court affirmed the hearing officer's September 30, 1993 decision. Judgment was entered accordingly on June 7, 1995.

On July 5, 1995, Appellant filed a notice of appeal. The appeal was dismissed on August 31, 1995 as premature.[1] An amended judgment was filed on October 20, 1995. Appellant again filed an appeal on November 1, 1995. The appeal was again dismissed on January 10, 1996 as the judgment was not final and the court continued to lack appellate jurisdiction. A second amended judgment was filed on April 3, 1996. On May 2, 1996, Appellant filed a timely notice of appeal from the April 3, 1996 judgment and the May 16, 1995 order.

## DISCUSSION

### A. The Federal Preemption Issue

■ Appellant contends that the circuit court erred in concluding that federal law preempted his state equitable defenses. We agree.

In remanding this case to the circuit court, the federal court ruled that Appellant's equitable estoppel defense was not preempted by federal law. We agree with the federal court's analysis on the preemption issue and likewise conclude that Appellant's state equitable estoppel defense was not preempted.

### B. The Equitable Estoppel Issue

■ The application of the doctrine of equitable estoppel against the government is not favored. *Kramarevcky v. Washington*, 122 Wash.2d 738, 863 P.2d 535, 538 (1993). *See also*, *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). While the Hawai'i Supreme Court has "explicitly maintained the validity of the notion that the government can be estopped[,]" *Cudal v. Sunn*, 69 Haw. 336, 346, 742 P.2d 352, 358 (1987) (quoting *Filipo v. Chang*, 62 Haw. 626, 635, 618 P.2d 295, 300 (1980)) (internal brackets omitted) and that "the doctrine of estoppel is applicable to prevent manifest injustice to the plaintiff[,]" *Cudal* at 346, 742 P.2d at 358, the supreme court has also placed "significant limitations" on the application of the doctrine against the government.

---

1. The August 31, 1995 Order of Dismissal stated that "the June 7, 1995 judgment is not a final judgment entered pursuant to HRCP [Hawai'i Rules of Civil Procedure Rule] 58 because it fails to enter judgment in favor of and against the parties[.]"

The supreme court has recognized, for example, that

estoppel cannot be applied to actions for which the agency or agent of the government has no authority. Courts have taken great pains to distinguish those acts which were ultra vires from those which were irregular for some reason in their execution.

*Filipo v. Chang*, 62 Haw. at 634, 618 P.2d at 300. *See, e.g., Kobayashi v. Zimring*, 58 Haw. 106, 566 P.2d 725 (1977) (holding that the fact that the State of Hawai'i, through its tax department, had collected property taxes for several years from the owner of a parcel of land did not estop the State from asserting a claim to that parcel of land).

■ Additionally, "estoppel may not be used in such a way as to hinder the state in the exercise of its sovereign power." *Id.* at 634, 618 P.2d at 300. For example, the doctrine of estoppel will not be applied to preclude a state from enacting and enforcing police measures. *Godbold v. Manibog*, 36 Haw. 206, 214 (1942).

Furthermore, in order to invoke estoppel against the government, "one must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped *and* that such reliance was reasonable." *Simpson v. Department of Land & Natural Resources*, 8 Haw.App. 16, 25, 791 P.2d 1267, 1273 (1990) (quoting *Doherty v. Hartford Ins. Group*, 58 Haw. 570, 573, 574 P.2d 132, 134–35 (1978)) (emphasis in original).

■ Applying the foregoing principles to the factual situation presented by this case, we conclude that the circuit court correctly refused to apply the doctrine of equitable estoppel to preclude DHS from recouping the value of the food stamp overpayment to Appellant.

### 1. The Overpayment of Food Stamp Benefits to Appellant Was Ultra Vires

We observe at the outset that it is undisputed in this case that Appellant was not substantively eligible to receive food stamps while he was living in Sister's household.

Since DHS had no authority to confer food stamp benefits on Appellant during this period, the contrary representation made to Appellant by a DHS caseworker was unauthorized and ultra vires.

In *Cudal v. Sunn*, a case factually similar to this case, the Hawai'i Supreme Court refused to apply the doctrine of equitable estoppel to bar the Department of Social Services and Housing (DSSH), the predecessor to the current DHS, from recouping food stamp overpayments made to the plaintiff and her daughter. The plaintiff and her daughter had initially been considered members of their own household and received Aid to Families with Dependent Children (AFDC) and food stamp benefits. When they moved in with the plaintiff's parents, however, they became ineligible to receive such benefits as a separate household. Although DSSH was made aware of the change in circumstances, it made no efforts to adjust the benefits or recoup the overpayments for more than five months.

At a fair hearing conducted before a DSSH hearing officer, the plaintiff sought to dismiss the DSSH's claim against her on equitable estoppel grounds. The hearing officer held that there was no basis to dismiss the DSSH's recoupment action, prompting the plaintiff to seek judicial review. The circuit court reversed the hearing officer's decision, concluding that DSSH's inaction "constituted affirmative misconduct which estopped it from recouping any portion of the food stamps overpayments." *Id.* at 346, 742 P.2d at 358 (internal brackets and quotation marks omitted).

On appeal by DSSH, the supreme court held that the circuit court's invocation of estoppel against DSSH on the food stamp recoupment issue was clearly erroneous for three reasons:

To begin with, [the plaintiff] suspected there might be a reduction in the assistance she was entitled to when she and her daughter became part of another household. Furthermore, *that she was not entitled under the law to receive the vouchers issued to her in error also is not open to doubt.* And we could not say the department's failure to act for five months was

manifestly unjust for [the plaintiff] when under the federal regulation 'the State agency may choose to take action on those claims for which more than 12 months have elapsed.'

69 Haw. at 346–47, 742 P.2d at 358 (emphasis added, internal brackets omitted). The supreme court thus recognized that the plaintiff's legal authorization to receive the food stamp payments in question was a determinative factor in deciding whether DSSH should be estopped from recouping the value of the payments.

The United States Supreme Court has similarly decided that where payments out of the public treasury are involved, estoppel principles cannot be used to bar the federal government from collecting money benefits erroneously paid out. In *OPM v. Richmond,* 496 U.S. 414, 427, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990), the Court noted that it had never upheld an estoppel claim against the federal government for the payment of money that Congress had not authorized. The Court explained that applying estoppel against the government in such instances could violate the Appropriations Clause, Art. I, § 9, cl. 7,[2] of the United States Constitution:

> If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive.... Estoppel would give this advice the practical force of law, in violation of the Constitution.

*Id.* at 428, 110 S.Ct. at 2473. The Court also observed that other statutes passed by Congress support the notion that the federal government should not be estopped based on the misrepresentations or erroneous advice of its employees:

> The provisions of the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, also provide a strong indication of Congress' general approach to claims based on governmental misconduct, and suggest that it has considered and

rejected the possibility of an additional exercise of its appropriation power to fund claims similar to those advanced here. The FTCA provides authorization in certain circumstances for suits by citizens against the Federal Government for torts committed by Government agents. Yet the FTCA by its terms excludes both negligent and intentional misrepresentation claims from its coverage. See § 2680(h). The claim brought by respondent is in practical effect one for misrepresentation, despite the application of the "estoppel" label. We would be most hesitant to create a judicial doctrine of estoppel that would nullify a congressional decision against authorization of the same class of claims.

> Indeed, it would be most anomalous for a judicial order to require a Government official, such as the officers of OPM, to make an extrastatutory payment of federal funds. It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress. See 31 U.S.C. §§ 1341, 1350. If an executive officer on his own initiative had decided that, in fairness, respondent should receive benefits despite the statutory bar, the official would risk prosecution. That respondent now seeks a court order to effect the same result serves to highlight the weakness and novelty of his claim.

*Id.* at 429–30, 110 S.Ct. at 2474.

Finally, the Supreme Court held, on public policy grounds, that estoppel against the government should not be invoked to preclude recoupment of claims involving the public fisc based on erroneous advice by government employees:

> [A]cceptance of estoppel claims for Government funds could have pernicious effects. It ignores reality to expect that the Government will be able to "secure perfect performance from its hundreds of thousands of employees scattered throughout

---

**2.** The Appropriations Clause of the United States Constitution, Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"

the continent." To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

Also questionable is the suggestion that if the Government is not bound by its agents' statements, then citizens will not trust them and will instead seek private advice from lawyers, accountants, and others, creating wasteful expenses. Although mistakes occur, we may assume with confidence that Government agents attempt conscientious performance of their duties and in most cases provide free and valuable information to those who seek advice about Government programs. A rule of estoppel might create not more reliable advice, but less advice. The natural consequence of a rule that made the Government liable for the statements of its agents would be a decision to cut back and impose strict controls upon Government provision of information in order to limit liability. Not only would valuable informational programs be lost to the public, but the greatest impact of this loss would fall on those of limited means, who can least afford the alternative of private advice. The inevitable fact of occasional individual hardship cannot undermine the interest of the citizenry as a whole in the ready availability of Government information. The rationale of the Appropriations Clause is that if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress.

*Id.* at 433–34, 110 S.Ct. at 2476.

The reasoning of the Supreme Court in *Richmond* is applicable here. It is undisputed that Appellant did not meet the eligibility requirements to collect food stamps during the period in question. Permitting Appellant to estop DHS from collecting the value of the food stamps overpaid to Appellant would permit Appellant to keep public funds that were not authorized for such purposes. We have no authority to judicially invoke estoppel under such circumstances.

### 2. *Reasonable and Detrimental Reliance*

Appellant contends that because he reasonably relied, to his detriment, on the advice of a caseworker that he was eligible for food stamps, he should not be required to repay the value of the food stamps which he was overpaid. We disagree.

As the United States Supreme Court noted in *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 61–62, 104 S.Ct. 2218, 2224–2225, 81 L.Ed.2d 42 (1984),[3] there can be no detrimental reliance sufficient to estop the government where the only "detriment is the inability to retain money that [the party] should never have received in the first place." The Supreme Court explained:

[T]his is not a case in which the respondent has lost any legal right, either vested or contingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to do something which could be corrected at a later time.

*Id.* at 61–62, 104 S.Ct. at 2225.

In this case, since it was undisputed that Appellant was not entitled to receive the food stamps for which recoupment is being sought, Appellant did not lose a legal right when he relied on the caseworker and the doctrine of detrimental reliance is thus inapplicable.

**3.** In *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the United States Supreme Court was called upon to determine whether the federal government should be estopped from recovering Medicare funds provided to a health care provider for services rendered to patients eligible for Medicare benefits by employees of the provider whose salaries were funded by the Comprehensive Employment and Training Act (CETA), another federal program. The health care provider had requested funding from both Medicare and CETA funds in reliance on advice from a fiscal intermediary of the federal government that such double reimbursement was permissible. The Supreme Court held that estoppel was not applicable.

### 3. *Manifest Injustice*

Appellant contends that the application of equitable estoppel is necessary here to prevent manifest injustice. Appellant points out that DHS took six months to initiate action to correct its administrative error. Moreover, imposing a repayment burden on Appellant, who lives at or below the national poverty line, will result in manifest injustice.

As the supreme court noted in *Cudal*, however, applicable federal regulations required that DHS, "[a]t a minimum, ... shall take action on those claims for which 12 months or less have elapsed between the month an overissuance occurred and the month the State agency discovered a specific case involving an overissuance." 7 CFR § 273.18. DHS's action to recoup the value of the overissuances of food stamps to Appellant was thus obligatory on DHS's part and was filed well within the required time period. Under the circumstances, we are unable to conclude that it would be manifestly unjust for DHS to seek recoupment from Appellant.

### CONCLUSION

In light of the foregoing discussion, we conclude that the circuit court erred when it determined that federal law preempted the application of Hawai'i law on equitable estoppel in the area of food stamp overissuances. However, the circuit court's conclusion that equitable estoppel should not be invoked to preclude recovery of the value of DHS's overpayments was correct.

Accordingly, the April 3, 1996 judgment and the May 16, 1995 order of the circuit court from which this appeal was taken are affirmed. Our disposition of this appeal renders it unnecessary to consider Appellant's remaining issues on appeal.