42 P.3d 657

Connie B. MUÑOZ and Peter Muñoz, Plaintiffs–Appellants,

v.

Susan M. CHANDLER, Director, Department Of Human Services, State of Hawai'i, Defendant–Appellee.

No. 23485.

Intermediate Court of Appeals of Hawai'i.

Feb. 21, 2002.

Connie B. Muñoz and Peter B. Muñoz, on the briefs, plaintiffs-appellants pro se.

Lisa M. Itomura, Deputy Attorney General, State of Hawai'i, on the brief, for defendant-appellee.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by WATANABE, J.

Plaintiffs–Appellants Connie B. Muñoz (Connie) and Peter Muñoz (Peter) (collectively, the Muñozes or Appellants) appeal from the May 10, 2000 judgment entered by the Circuit Court of the Second Circuit (the circuit court), Judge Joseph E. Cardoza presiding, that affirmed the October 30, 1998 decision of the Appeals Administrator (the AA) for Defendant–Appellee Susan M. Chandler (Chandler), Director of the Department of Human Services for the State of Hawai'i (DHS), which concluded that DHS had overpaid the Muñozes $294.00 in Aid to Families with Dependent Children (AFDC) benefits during September and October 1996.

The Muñozes' primary contentions on appeal [1] are as follows: (1) DHS deprived them of their constitutional right to due process by conducting their hearing to challenge the amount of their overpayment by telephone; (2) DHS violated its own rules in conducting the telephone hearing; (3) DHS violated government rules and law by refusing to specify the legal authority under which the telephone hearing was to be held; and (4) DHS improperly deprived them of their right to have legal counsel present at their hearing.

Based on our review of the record, we agree with the Muñozes' last three contentions. Accordingly, we vacate the circuit court's judgment and remand this case to the circuit court, with instructions that this case be remanded to DHS for a new hearing. Our disposition of this appeal renders it unnecessary to address the Muñozes' first contention.

## BACKGROUND

In 1996, the Muñozes, who are both disabled from working, were receiving AFDC benefits for themselves and their son, Miguel, who was born on August 30, 1978. On September 25, 1996, DHS sent Connie a notice that stated, in relevant part, as follows:

EFFECTIVE NOVEMBER 1996 YOUR FINANCIAL ASSISTANCE PAYMENT SHALL BE STOPPED BECAUSE THERE IS NO ELIGIBLE DEPENDENT CHILD IN THE HOME. *MIGUEL MU[Ñ]OZ HAS TURNED 18 ON 08/30/96 AND HAS GRADUATED FROM HIGH SCHOOL. SINCE YOU ARE ENTITLED TO TIMELY NOTICE OF FINANCIAL CLOSURE[,] BENEFITS FOR SEPTEMBER AND OCTOBER 1996 WERE AUTHORIZED BUT WILL BE CONSIDERED AN OVERPAYMENT FOR THOSE MONTHS—NOTICE TO BE SENT[.]

THIS ACTION IS BASED ON HAWAII PUBLIC WELFARE MANUAL SECTION(S): 17–649–4,[2] 17–656–3,[3] 17–656–4.[4]

---

1. Plaintiffs–Appellants Connie B. Muñoz (Connie) and Peter Muñoz (Peter) (collectively, the Muñozes) also contend that DHS failed to provide them with timely and adequate notice that their Aid to Families with Dependent Children (AFDC) benefits would be terminated. Citing Hawaii Administrative Rules (HAR) § 17–626, which we have been unable to locate, they claim that DHS was required to "mail a written notice at least 10 days prior to the effective date of action." That is, they claim that DHS should have notified them at least ten days prior to their son, Miguel, turning eighteen years old that their AFDC benefits would terminate on Miguel's birthday. The record indicates, however, that DHS's notice of termination of AFDC benefits, which was mailed to the Muñozes on September 24, 1996, expressly provided that the termination would be effective in November 1996. Therefore, the Muñozes received timely notice that their benefits would cease. In addition, the Hawai'i Supreme Court has recognized that although the State of Hawai'i (the State) is required by federal and state regulations to take "prompt action" to recoup AFDC benefits paid in error, the State's failure to commence recoupment efforts within a prescribed period does not estop it from recovering the overpayments. *Cudal v. Sunn*, 69 Haw. 336, 742 P.2d 352 (1987).

2. HAR § 17–649–4 provides, in relevant part:

   *Termination of benefits.* (a) Benefits shall be terminated effective the first day of the month following the month in which the recipient is found to be ineligible if the conditions of adverse notice are met. When the conditions of adverse notice are met, termination shall be effective the first day of the month the conditions of adverse notice are met.
   (b) Benefits shall be terminated when:
   . . . .
   (5) The recipient fails to meet any one of the necessary requirements of eligibility[.]

3. At the time, HAR § 17–656–3 provided:

   *Age Requirement.* (a) A needy child who is under eighteen years of age and who meets all other requirements of eligibility shall be eligible for assistance.
   (b) Assistance may be provided to a child aged eighteen if the child is a full-time student in a secondary school or in a program of an equivalent level of vocational training and is reasonably expected to complete the program before reaching age nineteen.
   (c) The child shall be eligible for the month the child reaches eighteen years of age or completes the program specified in subsection (b) provided the child was eligible on the first of the month.
   HAR § 17–656–3 (1993), *repealed* 1997.

4. At the time, HAR § 17–656–4 provided, in relevant part:

   Specified relative and place of residence. A needy child shall be living with one of the relatives specified in subsection (b) in a residence maintained as the child's own home in order to be eligible. The home shall be a family

FAIR HEARING RIGHTS AND OTHER IMPORTANT INFORMATION ARE EXPLAINED ON THE BACK OF THIS NOTICE. IF YOU WISH CONTINUED BENEFITS WHILE AWAITING A FAIR HEARING, YOUR WRITTEN REQUEST FOR A FAIR HEARING MUST BE RECEIVED BY OCTOBER 04, 1996.

. . . .

HOUSEHOLD WILL NO LONGER BE ELIGIBLE FOR FREE NO–FAULT CAR INSURANCE EFFECTIVE OCTOBER 31, 1996. YOU MAY REAPPLY FOR FINANCIAL BENEFITS UNDER THE GENERAL ASSISTANCE PROGRAM FOR YOU AND SPOUSE[.] HOWEVER[,] THIS PROGRAM DIFFERS FROM THE AFDC PROGRAM YOU HAVE PARTICIPATED IN. IF INTERESTED[,] COME IN TO COMPLETE AN APPLICATION.

(Footnotes added.) The reverse of the notice provided, in relevant part:

If you do not agree with the intended change, you may call your worker or you may have an informal review meeting with your worker's supervisor to present evidence to prevent or correct the intended action.

You also have the right to request a fair hearing before a Hearing Officer. This request must be in writing on our Department's form or any other paper (oral request acceptable for food stamps) and must state why you don't agree with the change. Our office must receive this request within 90 days of the date of this notice.

The Muñozes responded to the foregoing notice by a November 23, 1996 letter, in which they explained that had they been given timely notice of the change in status, they would have applied for alternate financial aid to avoid "a two[-]month 'void'" in their benefits. In the letter, the Muñozes stated: "We certainly agree and would abide by a voluntary repayment plan of funds payed [sic] over and above what we received

for September and October based on our eligible amount that we would have been entitled to for September and October had we, in fact, been given 'timely notice' and applied for same." The letter ended with the Muñozes requesting "a 'fair hearing' . . . or if that is not possible that you cause a subpoena to be served upon us so that we might fairly and equitably present our side, to this one[-]sided matter[.]"

On December 4, 1996, the Muñozes sent another letter to DHS, again requesting a hearing concerning the matter set forth in their letter of November 23, 1996 but expressing a preference for negotiating a settlement of the matter.

By a letter mailed on December 4, 1996, DHS informed the Muñozes, in pertinent part:

YOU RECEIVED $1,424 MORE IN FINANCIAL ASSISTANCE PAYMENTS THAN YOU WERE ENTITLED TO RECEIVE DURING THE MONTHS OF SEPTEMBER AND OCTOBER 1996; WHICH MUST BE REPAID TO THE DEPARTMENT. THE OVERPAYMENT OCCURRED BECAUSE EFFECTIVE 09/96 THERE WAS NO ELIGIBLE DEPENDENT CHILD IN THE HOME. MIGUEL MU[Ñ]OZ TURNED 18 YRS OLD 08/30/96 AND HAD GRADUATED FROM HIGH SCHOOL IN JUNE 1996.

. . . .

[xx] OUR FISCAL OFFICE WILL BE SENDING YOU A BILL AND ADVISING YOU AS TO HOW AND WHERE TO PAY.

Five days later, on December 9, 1996, DHS mailed another letter to the Muñozes that reduced the amount of their alleged overpayment obligation to $972.00 "TO REFLECT [THE] HOUSEHOLD'S FINANCIAL ELIGIBILITY EFFECTIVE 10/07/96 IN THE GENERAL ASSISTANCE FINANCIAL PROGRAM FOR [THE MUÑOZES] ONLY (APPLICATION FORM RECEIVED

---

setting maintained by the relative who has assumed the responsibility for the daily care of the needy child.

. . . .

(b) Persons considered to be specified relatives shall include:
(1) Father, mother . . . .
HAR § 17–656–4 (1993), *repealed* 1997.

10/07/96)." The letter also informed the Muñozes that DHS's "FISCAL OFFICE WILL BE SENDING YOU A BILL AND ADVISING YOU AS TO HOW AND WHERE TO PAY."[5]

DHS's fiscal office, however, neither sent the Muñozes the promised bill nor advised them how and where to pay the $972.00. DHS's next communication to the Muñozes was a "STATE TAX REFUND PRE–SET-OFF NOTICE," mailed on July 15, 1997, which informed them, in part, as follows:

> IF YOU ARE ENTITLED TO A HA-WAII STATE INCOME TAX REFUND FOR ANY TAX YEAR, [DHS] PROPOS-ES TO TAKE IT BECAUSE YOU HAVE NOT MADE REGULAR PAYMENTS FOR A FINANCIAL, FOOD STAMP, OR MEDICAL ASSISTANCE DEBT OF AT LEAST $972.00 THAT YOU OWE THE DEPARTMENT. HAWAII REVISED STATUTES [(HRS)] CHAPTER 231 AUTHORIZES THE DEPARTMENT TO SETOFF [sic] STATE INCOME TAX REFUNDS TO REPAY DEBTS.
>
> * * * YOU MAY REQUEST
> A REVIEW * * *
>
> IF YOU HAVE MADE REGULAR PAY-MENTS TOWARD THE DEBT, YOU DO NOT BELIEVE THAT YOU OWE A DEBT, OR IF YOU WANT A FURTHER EXPLANATION ABOUT YOUR DEBT, WE WILL REVIEW YOUR CASE. PLEASE CONTACT US BY 08/14/97 FOR A TELEPHONE REVIEW, OR TO ARRANGE FOR AN OFFICE VISIT. . . .
>
> * * * YOU HAVE A RIGHT
> TO A HEARING * * *
>
> IF YOU DISAGREE WITH THE RE-VIEW, YOU HAVE THE RIGHT TO A HEARING. IN ORDER TO GET A HEARING, YOU MUST FIRST RE-QUEST A REVIEW. IF YOU DO NOT REQUEST A REVIEW, YOU WILL NOT BE GIVEN A HEARING BEFORE

WE TAKE YOUR TAX REFUND. SOME OF THE DEFENSES YOU MAY HAVE AGAINST THE TAX REFUND SETOFF ARE:

> . . . .
>
> * MISTAKES WERE MADE IN CAL-CULATING THE BALANCE OF YOUR DEBT.
>
> . . . .
>
> * YOUR HOUSEHOLD WAS NEVER GIVEN NOTICE AND AN OPPOR-TUNITY FOR A HEARING ON THE DEBT AS REQUIRED BY LAW.

By a letter dated July 18, 1997, the Muñozes requested an in-person, "complete review of this entire issue of an alleged $972.00 debt" based "on the fact that we do not believe we owe a debt." DHS responded by letter dated July 24, 1997, in relevant part, as follows:

> We reviewed our records and determined that you do owe the debt for which we intend to take your tax refund. IF YOU WANT A HEARING ON OUR INTEN-TION TO SETOFF [sic] YOUR TAX RE-FUND, YOU MUST FILL IN THE BOT-TOM SECTION OF THIS FORM AND SEND THE *ENTIRE* FORM TO US WITHIN FOURTEEN (14) DAYS OF THE DATE OF THIS NOTICE!

(Emphasis in original.) Desiring further clarification from DHS, the Muñozes refused to sign the bottom of the form. However, they did write on the form that they wanted a hearing because "[w]e did not have an 'informal review[.]' "

By a letter to the DHS Tax Setoff Appeals office dated July 29, 1997, the Muñozes confirmed their understanding that the tax intercept matter would be sent "to the Fair Hearing office for the purposes of setting up a fair hearing[.]" On August 4, 1997, the AA responded, partly, as follows: "We will try to schedule a hearing very soon so that we can make a final decision within 120 days of your

---

**5.** In their opening brief, the Muñozes claim to have sent a February 25, 1997 letter to the Department of Human Services (DHS), requesting a hearing to contest the $972.00 overpayment amount. Unlike other correspondence from the Muñozes to DHS, copies of which are part of the record, the February 25, 1997 letter is mentioned only in the opening brief and not included as part of the record on appeal.

request. If you wish to have someone assist you at the hearing, such as Legal Aid Society, it will be your responsibility to make the arrangements." Subsequently, by a letter dated November 6, 1997, DHS requested Connie to "CONTACT [THE DHS] OFFICE TO MAKE AN APPT. FOR AN INTERVIEW ... TO BE HELD NO LATER THAN NOVEMBER L4,[6] 1997." On November 12, 1997, a program specialist with DHS's Benefit, Employment and Support Services Division advised the Muñozes in writing as follows:

> Your request for a hearing regarding the notice to intercept your state tax refund in 1998 was referred to this office. Your letter stated that your request for an informal review or an appeal of the overpayment claim for $972.00 [in the AFDC program] was never acted upon.

> After a case review, it has been determined your state tax refund will *not* be intercepted next year. Your request has been referred to Mrs. Grace Seiki, supervisor of the East Maui Income Maintenance Unit II for follow-up.

> Therefore, your names will be withdrawn from the tax setoff list for next year. The Administrative Appeals Office will be notified of our determination through a copy of this letter.

(Brackets and emphasis in original.)

The Muñozes responded to the foregoing letter on November 14, 1997 with the following comments:

> 1. IT IS OUR UNDERSTANDING THAT THE DEPARTMENT OF HUMAN SERVICES HAS 90 DAYS, FROM RECEIPT OF A REQUEST FOR A "FAIR HEARING", TO CONDUCT A "FAIR HEARING", AND RENDER A DECISION.

> 2. WE REQUESTED A "FAIR HEARING" ON 23 NOVEMBER 1996, AND, AGAIN, ON 4 DECEMBER 1996.

> 3. WE WERE DENIED THAT RIGHT TO A "FAIR HEARING", BOTH UNDER FEDERAL AND STATE MANDATED RULES. WE BELIEVE OUR DUE PROCESS UNDER BOTH STATE AND FEDERAL RULES WAS VIOLATED.

> 4. IT IS OUR UNDERSTANDING OF THE HAWAI'I ADMINISTRATIVE RULES THAT A "RECIPIENT" IS GIVEN 90 DAYS, FROM DATE OF NOTICE OF ADVERSE ACTION, TO REQUEST A "FAIR HEARING". IF THAT PERSON FAILS TO REQUEST A "FAIR HEARING" IN THAT ALLOTTED TIME, THE RECIPIENT LOSES THEIR RIGHT TO A "FAIR HEARING[.]"

> 5. WE BELIEVE A RECIPROCAL RULE EXISTS WHEREBY THE DEPARTMENT OF HUMAN SERVICES IS GIVEN 90 DAYS IN WHICH TO CONDUCT AND RENDER A DECISION, AFTER RECEIPT OF A REQUEST FOR A "FAIR HEARING", OR THEY DEFAULT. A DEFAULT IN THIS SENSE, WE BELIEVE IS: WHERE, IN THIS CASE, THE PARTY HAS A LEGAL OBLIGATION TO DO SOMETHING, AND THEY FAIL TO DO IT. PURSUANT TO THE ABOVE, I BELIEVE THIS WHOLE MATTER CAN BE RESOLVED BY:

> A. OUR FILIING [sic] OF A SUMMARY DEFAULT JUDGMENT AGAINST [CHANDLER], OR

> B. THAT [DHS] PROVIDE US A CERTIFIED LETTER WHICH ABSOLVES [THE MUÑOZES], ET AL., FOR ANY AND ALL RESPONSIBILITY CONCERNING THIS ALLEGED DEBT OF $972.00 (OVERPAYMENT).

By a letter dated November 17, 1997, the AA informed the Muñozes that in light of the decision of DHS to withdraw its proposed setoff of the Muñozes' state tax refund, their administrative hearing request was being closed, "since there is no [longer a] hearing issue."

Unhappy with this result since they still contested that they owed DHS $972.00, the Muñozes apparently filed a "Complaint and Summons" in the circuit court in Civil No.

---

**6.** Since the text of the letter was typed in capital letters, and Peter met with DHS on or around November 12, 1997, we assume that the "L4" should have read "14".

97–0914(2) on December 4, 1997.[7] Less than two weeks later, on December 15, 1997, DHS sent Connie a letter informing her that her financial assistance overpayment obligation had been reduced to $294.00 because it was determined that "EFFECTIVE SEPTEMBER 1996[, THE MUÑOZES] REMAINED ELIGIBLE FOR FINANCIAL ASSISTANCE IN THE STATE'S GENERAL ASSISTANCE PROGRAM AND HAD [THEIR] CASE BEEN TIMELY UPDATED, THE MONTHLY BENEFIT LEVEL WOULD HAVE REFLECTED NO MORE THAN A $147 DECREASE REPRESENTING THE REMOVAL OF THEIR 18YR [sic] OLD CHILD (WHOM [sic] HAD GRADUATED FROM MAUI HIGH SCHOOL ON 06/01/96)[.]"

On January 6, 1998, the AA sent a letter to the Muñozes, informing them that their request for a hearing had been received and a hearing would be scheduled "very soon so that we can make a final decision within 90 days of your request." The Muñozes responded to DHS the next day, seeking clarification of the reason for the hearing, since they did "NOT RECALL HAVING MADE A REQUEST FOR A 'FAIR HEARING', IN THE PAST SEVERAL MONTHS." On January 9, 1998, the AA explained that her office had not received the Muñozes' December 4, 1996 letter requesting a hearing until December 31, 1997. The AA also stated that "[t]he Appeals Office will process the request even though a final decision could not be made within 90 days of the request."

On January 20, 1998, DHS wrote to the Muñozes a letter which informed them as follows:

We are recommending that [the AA] deny your appeal request dated November 23, 1996 which was received by [DHS] on November 27, 1996. . . . Your appeal was filed before [DHS] formally claimed an overpayment. Therefore, there is no appeal issue.

We are recommending that [the AA] deny your appeal request of December 4, 1996 which was received by [DHS] on December 6, 1997. . . . [DHS] withdraws the overpayment claim notice printed on December 3, 1996 as well as the overpayment claim notice printed on December 6, 1996 which decreased the amount claimed from $1424.00 to $972.00. . . . Therefore, there is no appeal issue.

However, we sent you a notice printed on December 12, *1997* to claim $294.00 for the period September 1, 1996 through October 1996. . . . This notice states that the outstanding claim is the difference in assistance of $147.00 per month for a three[-]member household (which included Miguel Mu[ñ]oz) and a two[-]member household ( [the Muñozes] after Miguel became ineligible for financial benefits).

You may file an appeal for this notice through your case worker at East Maui II Income Maintenance Unit. Your appeal must be received by the Department within ninety (90) days of the date of the notice.

(Emphasis in original.)

By a letter dated January 22, 1998, the AA informed the Muñozes that based on her review of DHS's January 20, 1998 letter to the Muñozes, their fair hearing appeal, which was predicated on their December 6, 1996 request, was being "dismissed because there is no hearing issue." In dismissing the appeal, the AA cited Hawaii Administrative Rules (HAR) § 17–602.1–9.[8]

---

7. The record on appeal does not contain a copy of the complaint and summons filed in Civil No. 97–0914(2).

8. HAR § 17–602.1–9 provides:
   *Denial or dismissal of a request for hearing.* (a) A hearing shall not be granted by the department when either federal or state law requires automatic grant adjustment for classes of recipients unless the appeal is for incorrect grant computation.
   (b) A hearing shall not be granted by the department when the claimant has withdrawn the request in writing. Where the claimant verbally reports a desire to withdraw the hearing request, the claimant shall be advised that the withdrawal shall be submitted in writing. If the claimant prefers, the department shall confirm the claimant's request to withdraw in writing to the claimant.
   (c) The branch shall determine whether the request for hearing is based on action taken by the department as a result of subsection (a). These requests shall be denied by the branch.
   (d) A hearing shall not be granted by the hearing officer when the claimant has abandoned the request. Abandonment occurs when the claimant or the authorized represen-

By a letter to DHS dated March 4, 1998, the Muñozes disputed that they owed DHS $294.00 and requested a fair hearing to resolve the dispute. By a written response dated March 18, 1998, the AA acknowledged receipt of the Muñozes' "request for a fair hearing" and informed them, in part, that

> [w]e will try to schedule a hearing very soon so that we can make a final decision within 90 days of your request. However, if a final decision has not been made and implemented within ninety calendar days of your fair hearing request and you are not receiving assistance, you may be entitled to receive help from the ninety-first day under Section 17–602.1–17 of the [HAR].
>
> If you wish to have someone to assist you at the hearing, such as the Legal Aid Society, it will be your responsibility to make the arrangements.
>
> We will notify you via certified mail as soon as we are able to arrange a date and place for the hearing.

By a letter dated April 8, 1998, the AA notified the Muñozes [9] that an informal video conference hearing would be held on Thursday, April 23, 1998, at 11:00 a.m., "in accordance with Chapter 91 of the [HRS] and Chapter 17–602.1 of the [HAR,]" on the issue of "[w]hether [DHS] may recover a financial overpayment for the months of September

1996 and October 1996." An "Internal Communication Form" dated April 3, 1998, which was attached to the letter, detailed the facts and law upon which DHS based its position that the Muñozes owed DHS $294.00. The letter also advised the Muñozes that they would "be given an opportunity to present [their] complaint" at the hearing and could, if they wished, "bring legal representatives or witnesses to speak in [their] behalf."

By a letter dated April 9, 1998, the Muñozes objected to the proposed video conferencing format of the hearing, claiming that Peter, who would be representing Connie at the hearing, was "frightened of cameras[.]" Arguing that they had a right to have a hearing officer physically present at the hearing, the Muñozes stated that they wished to avail themselves of a hearing when "a hearing officer will be on Maui to conduct the hearing in a proper format."

In a letter to the Muñozes dated April 15, 1998, the AA offered two alternatives to the video conference format for the hearing:

> You may appoint a representative to appear at the hearing if you do not want to appear at the hearing or the hearing may be conducted by telephone. Either your representative or you should appear at 54 High Street on Thursday, April 23, 1998 at 11:00 a.m.

---

tative, without good cause, fails to appear at the hearing scheduled for the claimant.

(1) The hearing officer shall send the claimant a letter stating that the appeal is considered abandoned unless there was good cause for the claimant's failure to appear. The claimant shall be notified that the request shall continue only if the claimant presents good cause for the failure to appear and contacts the agency within ten calendar days of the notice. If no reply is received within the ten calendar days, the hearing request shall be considered abandoned. If the tenth day falls on a weekend or holiday, the tenth day shall then be the working day after the weekend or the holiday.

(2) Good cause may be established on the basis of one of the following factors:

(A) Death in the family;

(B) Personal injury or illness which reasonably prohibits the claimant from attending the hearing; or

(C) Sudden and unexpected emergencies.

(e) *When a request for a hearing is denied or dismissed, the department shall inform the claimant in writing, stating the reasons for the denial or dismissal. Written notice shall be provided the claimant within ninety calendar days of the date of hearing request.*
HAR § 17–602.1–9 (emphasis added).

9. There is no evidence in the record on appeal that the notice of the hearing was sent to Connie by registered or certified mail with return receipt requested, as required by Hawaii Revised Statutes § 91–9.5 (1993), which provides, in relevant part:

> **Notification of hearing; service.** (a) Unless otherwise provided by law, all parties shall be given written notice of hearing by registered or certified mail with return receipt requested at least fifteen days before the hearing.

Moreover, since the letter to Connie was dated April 8, 1998 and informed Connie that the hearing would be held on April 23, 1998, exactly fifteen days after April 8, 1998, we have serious reservations as to whether the requisite fifteen days' notice was met in this case.

[HAR] § 17–602.1–13 requires the claimant to appear in person at the hearing unless the hearing is conducted by telephone. If you or a representative do not appear, we will assume that you are no longer interested in a hearing and your appeal will be dismissed. We may reopen your hearing request only for good cause reasons such as death in the family, severe personal injury or illness or other extreme emergency.

The Muñozes responded to the AA with a letter dated April 16, 1998, requesting that the April 23, 1998 telephone hearing be continued. The Muñozes explained that since they had been advised that their hearing "will be conducted, in what [they] believe to be a very unorthodox manner, and in a way that is contrary to past experience," they believed it necessary to obtain legal counsel "for proper presentation of [their] case." The AA denied this request in an April 21, 1998 letter, stating:

The proceeding is not a criminal matter for which legal counsel is required. Furthermore, when you requested a hearing, you were informed of the time period in which the administrative proceeding is to occur and of your right to arrange for representation, if you desired.

The hearing may be held by telephone if you appear at 54 High Street at the appointed date and time. Enclosed is a copy of [HAR] Chapter 17–602.1 that governs hearings for the Benefit, Employment and Support Services Division.

After a series of letters were thereafter exchanged between the AA and the Muñozes, the AA notified the Muñozes by a communication dated May 6, 1998 that their "video conference hearing" had been rescheduled to May 28, 1998,[10] at 12:30 p.m., at 54 High Street, Room 125, Wailuku, Maui. Then, by a letter dated May 12, 1998, the AA informed the Muñozes that the May 28, 1998 hearing "will be a teleconference hearing. [Peter] may be present by telephone by calling the East Maui II Unit supervisor at 984–8300 at the appointed time."

By a letter to the AA dated May 22, 1998, the Muñozes reluctantly agreed that the May 28, 1998 hearing could "be conducted by telephone." The Muñozes, however, "vigorously protest[ed]" the denial of their "right to have a 'fair hearing' officer present" at the hearing, objected to "the 'video conference' . . . being forced on [them], without [their] consent[,]" and complained that they were being "prevented from having the luxury of consulting with legal counsel." By a letter dated May 27, 1998, the AA notified the Muñozes that the fair hearing the next day would be "a telephone hearing." The letter continued:

The hearing officer will be connected by telephone to you and the [DHS] representative. Please called [sic] the telephone number at the following location at the time listed below and provide the telephone number where you can be reached. The hearing officer will return the call and convene a hearing.

DATE: Thursday, May 28, 1998
TIME: 12:30 p.m.
TELEPHONE NUMBER: 984–8300

The record on appeal does not indicate exactly where the parties and witnesses were when the May 28, 1998 telephone hearing was conducted. It appears to be undisputed, however, that the AA was in Honolulu and Peter was patched in to the AA through a telephone on Maui. It is unclear whether DHS witnesses Betty Syfers (Syfers), an income maintenance worker II, and Grace Seiki (Seiki), a supervisor for East Maui, were at the same office location and speaking to the AA by speaker telephone, or whether they were in separate locations and patched in to the hearing by separate telephones.

The hearing began with the AA explaining to Peter that he had a right to examine all papers and documents that the AA used in

---

10. The record indicates that on April 28, 1998, the date of the originally scheduled hearing, Peter suffered a severe hypoglycemic episode related to his diabetes condition that left him incapacitated and unable to attend the hearing. After Peter's doctor confirmed Peter's episode, the AA rescheduled the hearing to May 28, 1998 but warned the Muñozes that in light of Peter's condition, "the household is best advised to prepare [Connie] or a representative to respond to [DHS's] claim for an overpayment. It is the responsibility of claimants to arrange for representation and you have been informed of your responsibility since a letter was sent on March 18, 1998 to acknowledge your request for hearing."

making a decision, that these documents had been forwarded to Peter the previous day, and that the AA "will be leaving the hearing record open for ten days in order that [Peter] may respond in writing to" the documents after he receives them. The AA also advised Peter of his "right to a representative" and to appeal any final decision to a court of law.

The AA then asked Syfers to explain "what happened here." Syfers responded as follows:

> Well, the issue is whether or not [DHS] ... may recover a financial overpayment for the months of September of '96 and October of '96. [The Muñozes] received financial assistance under the [AFDC] for themselves and their son, effective July 1 of 1998.
>
> Miguel graduated from high school in June of 1996 and became eighteen years old on August 31st [11] of '96. He therefore no longer qualified for financial assistance, effective September 1 of 1996.
>
> The financial case was not timely closed until effective November 1st of 1996.
>
> An Overpayment Claim Notice printed on December 12, 1997 informed [the Muñozes] that the overpayment amount was decreased to $294.00 for September and October of 1996.

(Footnote added.) Syfers went on to summarize DHS's position as follows:

> The position is there is no time limit to claim federally-funded AFDC overpayments which occurred after September 30, 1981.
>
> The notice printed on December 12, 1997 meets the notice requirements to claim an overpayment.
>
> Therefore [DHS] may recover the overpaid benefits of $294.00 for September 1, 1996 through October 31, 1996.

Peter opened the Muñozes' case by initially objecting to the teleconference format of the hearing. A lengthy colloquy then commenced between Peter and the AA, during which Peter attempted to discern whether he

and Connie had violated any rules or procedural requirements imposed on them in connection with the fair hearing. The AA informed Peter that this was not a case where DHS was claiming that the Muñozes were disqualified from receiving benefits because they had violated a rule. The only issue was whether or not the Muñozes were eligible for the amount of financial assistance they received in September and October 1996.

Peter then remarked: "But let's go to this matter of the overpayment. We don't—you know, there's no objection on our part that there was in fact an overpayment, but the matter is why was there an overpayment." Peter pointed out that the Muñozes had acknowledged in November 1996 that they had been overpaid AFDC benefits and initially

> had no problems with working out a repayment plan of $294.00, but we do have a problem with that now. The reasons being that due to [DHS's] violations of more rules than we have time to list, this whole business has cost us more money in time and expenses than the amount you folks say we owe. We would however agree to repayment of the $294.00 if your department could come up with a plan to reimburse our out-of-pocket expenses made in relation to this tremendous situation that cost us medical care and the rest of this. This went on because of this, the stress that this is causing and all that. You know, I mean—the whole thing—this whole thing has come down to a considerably [sic] more money than $294.00, flying a Deputy Attorney General over here and a—spending a morning in court and court time and all of the rest of this....
>
> We—in essence, we believe we should not be held responsible for employees of your department who have violated our due process rights over and over again. And we think—... if we had violated just a small fraction of the rules, this matter would have long time ago been remedied in your favor. We're open in negotiations of remedy in this matter, but you folks need

---

11. The birth certificate of Miguel that is in the record indicates that his birth date is August 30, 1978.

to make some offers that will be countable toward general fairness.

Following the close of the hearing, the AA issued a written decision dated October 30, 1998, which concluded, in relevant part, as follows: (1) DHS provided verification that Miguel turned eighteen years of age on August 30, 1996, thereby rendering the Muñozes' household ineligible to receive the $712.00 in monthly AFDC benefits they had been receiving; (2) the Muñozes received state warrants for AFDC benefits in the amount of $712.00 for the months of September and October 1996 but were eligible to receive only $565.00 in general assistance benefits for those months; (3) HAR § 17–683–23(a) requires that "[a]n overpayment made to individuals of an assistance unit receiving financial assistance shall be recovered by reducing the amount of any future financial assistance payable to individuals of the overpaid assistance unit when these individuals receive assistance in the same or a comparably funded financial assistance category as the category in which the overpayment occurred" (ellipses omitted); (4) HAR § 17–683–23(b) also specifies that "[a]n overpayment made to individuals of an assistance unit receiving financial assistance shall be recovered by appropriate action under state law against the income and assets of any individual of the overpaid financial assistance unit" (ellipses omitted); (5) "[HAR] § 17–683–2 does not limit the period in which an overpayment claim may be made"; (6) the Muñozes were overpaid $294.00 for the months of September and October 1996 and must repay said amount to DHS; (7) contrary to HAR § 17–602.1–17(a), the AA's decision was tardy, having been issued "beyond the ninetieth day from the date of the hearing request"; and (8) the constitutional claims raised by the Muñozes "are beyond the scope of this decision."

## THE PROCEEDINGS BEFORE THE CIRCUIT COURT

On November 24, 1998, the Muñozes filed in the circuit court, in Civil No. 98–0859(3), a document, entitled "Agency Appeal," which consisted of an Opening Brief, Declaration, Appendix, and Certificate of Service. The document was not served by a deputy sheriff or police officer in the manner required by Hawai'i Rules of Civil Procedure (HRCP) Rule 4(c) [12] but, instead, was hand carried by the Muñozes and personally served upon Chandler. Moreover, the Muñozes did not, as required by HRCP Rule 4(d),[13] serve a copy of the document on the state attorney general.

On February 9, 1999, the Muñozes filed in the circuit court a "Notice of Appeal" from the AA's October 30, 1998 decision, a "Statement of the Case," and a "Designation of Record." In the Statement of the Case, the Muñozes explained:

> On November 24, 1998 [the Muñozes] caused to be filed an 'Agency Appeal' with an 'Opening Brief', which allowed them ample time to conform to the thirty (30) day time period to file an 'Agency Appeal' regarding this matter. Due to [the Muñozes] not having the luxury of being able to afford to hire legal counsel, and their lack of knowledge of the intricacies of the proper procedural conduct in filing an 'Agency Appeal', [the Muñozes] caused to be filed the "Opening Brief" before, first, having filed the "Notice of Appeal" with the necessary appendages. This informa-

---

**12.** Hawai'i Rules of Civil Procedure (HRCP) Rule 4(c) states, in relevant part:

> **Same: By Whom Served.** Service of all process shall be made: (1) anywhere in the State by the sheriff or the sheriff's deputy, by some other person specially appointed by the court for that purpose, or by any person who is not a party and is not less than 18 years of age; or (2) in any county by the chief of police or the chief's duly authorized subordinate.

**13.** Rule 4(d) of the HRCP provides, in pertinent part, that personal service of a summons and complaint shall be made as follows:

> (4) Upon the State by delivering a copy of the summons and of the complaint to the attorney general of the State or to the assistant attorney general or to any deputy attorney general who has been appointed by the attorney general.
> (5) Upon an officer or agency of the State by serving the State and by delivering a copy of the summons and of the complaint to such officer or agency.

tion came to [the Muñozes], after a telephone call was made to Judge Boyd Mossman's secretary at approximately 1120 hours, February 1999, and in which the secretary stated that there was a "format" problem with these papers, and that this case has been sitting on the desk all this time.

The secretary further stated that she had turned the case over to her law clerk, and that the law clerk was supposed to have contacted the [Muñozes] regarding the problems with the "format" of these papers. The secretary advised [the Muñozes] to go ahead and file the "Notice of Appeal" and "Order for Certified and Transmission of Record".

On February 26, 1999, DHS's certified record on appeal was filed in the circuit court. On March 1, 1999, the circuit court entered an Order Setting Briefing Schedule, which ordered that the Muñozes' opening brief be filed on or before April 9, 1999, DHS's answering brief be filed on or before May 20, 1999, and the reply brief be filed on or before May 30, 1999. On June 3, 1999, the Muñozes filed a motion to dismiss the action brought against them by DHS on grounds that DHS had not filed its answering brief by the ordered date. After the deputy attorney general representing DHS explained that she was not aware of the Muñozes' prematurely filed February 9, 1999 brief and, indeed, had been specifically advised by the court clerk that the Muñozes had not filed an opening brief, the Muñozes' motion to dismiss was denied and a revised briefing schedule was ordered.

On January 31, 2000, the circuit court entered "Findings of Fact, Conclusions of Law, and Order Denying [the Muñozes'] Agency Appeal", and on February 9, 2000, the Muñozes filed a Notice of Appeal to the Hawai'i Supreme Court. However, on May 25, 2000, the supreme court dismissed their appeal on grounds that an HRCP Rule 58 and Rule 72(k) judgment had not yet been entered and, therefore, no appellate jurisdiction existed. On remand, the circuit court entered a "Judgment in a Civil Case" on May 10, 2000, and the Muñozes filed a new "Notice of Appeal" on May 31, 2000.

## DISCUSSION

### A. Whether the Circuit Court Had Appellate Jurisdiction to Entertain the Muñozes' Appeal

■ DHS initially contends that the Muñozes' appeal to the circuit court was untimely and, therefore, the circuit court, and, in turn, this court, lacks appellate jurisdiction to decide this case. DHS points out that although the AA's final decision was issued on October 30, 1998, the Muñozes did not file their "Notice of Appeal" in the circuit court until February 9, 1999.

The time requirement for appealing a final decision of an administrative agency is set forth in HRS § 91–14(b) (1993), which provides:

Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency pursuant to rule of court except where a statute provides for a direct appeal to the supreme court, which appeal shall be subject to chapter 602, and in such cases the appeal shall be in like manner as an appeal from the circuit court to the supreme court, including payment of the fee prescribed by section 607–5 for filing the notice of appeal (except in cases appealed under sections 11–51 and 40–91). The court in its discretion may permit other interested persons to intervene.

The Hawai'i Supreme Court has held, however, that requirements regarding the form of a notice of appeal are not jurisdictional, *City & County v. Midkiff*, 57 Haw. 273, 275–76, 554 P.2d 233, 235 (1976), and, therefore, deficiencies in the form of a notice of appeal "should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake." *Id.* (quoting 9 *Moore's Federal Practice* ¶ 203.18 (1975) (internal quotation marks omitted)).

In this case, the record reflects that the Muñozes, *pro se*, filed a document, entitled "Agency Appeal," in the circuit court on No-

vember 24, 1998, within the thirty-day period prescribed by HRS § 91–14. Although not titled "Notice of Appeal[,]" the document fairly communicated the Muñozes' intent to appeal the AA's decision. Moreover, the record contains no indication that the document misled or prejudiced DHS in any way. Therefore, we conclude that the circuit court had jurisdiction over the Muñozes' appeal from the AA's decision.

## B. *The Propriety of the Telephone Hearing*

The Muñozes maintain that the circuit court erred in entering Conclusion of Law No. 1, which stated as follows:

> There is no basis for requiring the DHS hearings officer to be physically present in the same room with [the Muñozes] during their fair hearing. Nor have [the Muñozes] alleged any prejudice resulting from the DHS hearings officer not being physically present in the same room with them during their fair hearing.

According to the Muñozes, "there appears to be due process violations involved in Appellants being forced to have their fair hearing conducted through a video-conferencing, and not with a hearing officer present at the hearing, which is required by their very rules! This matter is further augmented by the DHS Appeal's office failing to provide Appellants with the rules that allow for video-conferencing."

We need not address the due process arguments raised by the Muñozes because we agree with them that the teleconference format used by the AA to conduct their fair hearing violated DHS rules.

The procedures governing hearings requested by individuals dissatisfied with a DHS action to reduce or terminate assistance or determine an assistance overpayment amount are set forth in HAR title 17, subtitle 6, chapter 602.1, entitled "Hearings." Of particular relevance to this appeal is HAR § 17–602.1–13, which states, in part:

> *The hearing.* ....
>
> (b) *The claimant shall be required to appear in person at the hearing unless authorization for an authorized represen-*tative *was received by [DHS]. When mutually agreed upon by the applicant or recipient and [DHS], a hearing may be conducted over the telephone.* Unless both [DHS] and the claimant agree to the presence of other individuals, the hearing officer or other person conducting the hearing shall limit attendance to the following individuals necessary for the conduct of the hearing:
>
> (1) The claimant, the authorized representative, or both, interpreter, if any, legal counsel, and witnesses;
>
> (2) Representatives of the branch or unit office;
>
> (3) Representatives of the state family and adult services division; and
>
> (4) Hearing officer and members of the hearing office staff.
>
> (c) An interpreter shall be provided by the department when requested by the claimant.
>
> (d) The claimant or the authorized representative shall, upon request, be able to examine the case record as well as all available documentary evidence that shall be used by the department at the hearing as specified in section 17–602.1–5.
>
> (e) *The hearing shall be conducted at a reasonable time, date, and place and shall generally be held in the jurisdiction of the branch in which the claimant is living at the time of the hearing. The hearing shall be conducted at a location specified by the hearing officer* unless the claimant is unable to travel to the site because of health or transportation problems.

(Emphases added.) The foregoing language clearly requires that the claimant be present at a hearing and also limits attendance at the hearing to designated individuals, including the branch staff and the hearing officer. Additionally, the rule specifically requires that the hearing be held "in the jurisdiction of the branch in which the claimant is living at the time of the hearing" and "at a location specified by the hearing officer[.]" Furthermore, a telephone hearing is only allowed when "mutually agreed upon" by DHS and the claimant. The language of HAR § 17–602.1–13, thus, clearly envisions a hearing at one site, in the place where the claimant resides,

at which all the parties and the hearing officer are present.

In this case, the AA, over the Muñozes' vociferous objection, conducted a telephone hearing on the Muñozes' appeal from Honolulu and was not personally present at a site on Maui, where the Muñozes resided. Moreover, although Peter and DHS branch staffers Syfers and Seiki were on Maui during the hearing, they were not physically present at the same site. The telephone hearing was thus conducted in clear violation of the requirements of HAR § 17–602.1–13.

Courts of other jurisdictions with administrative rules akin to HAR § 17–602.1–13 have similarly held that a telephone hearing to terminate or reduce public welfare assistance benefits does not comport with applicable rules and is thus improper.

In *Sleeth v. Illinois Dep't of Public Aid,* 125 Ill.App.3d 847, 81 Ill.Dec. 117, 466 N.E.2d 703 (1984), for example, the Illinois Appellate Court affirmed a circuit court judgment invalidating the procedures used by the Illinois Department of Public Aid (IDPA) for conducting the termination of disability benefits hearings of the Peoria County plaintiffs by telephone conference and remanding the cases for new hearings. Under the Illinois telephone conference procedures, the plaintiffs, their representatives and witnesses, together with county officer personnel, were required to be at the Peoria County IDPA office during the hearing, while the hearing officers at the other end of the conference calls were in the Chicago IDPA office. The hearing officers were not able to observe any of the persons who testified. *Id.* at 705. The Illinois Public Aid Code required as follows:

> Upon receipt of an appeal the Illinois Department, Public Aid Committee, or Commissioner of Appeals, as the case may be, shall review the case. The appellant shall be entitled to appear *in person* and to be represented by counsel. He [or she] shall be afforded an opportunity to present all relevant matter in support of his [or her] claim for aid, or his [or her] objection to (a) termination of aid, or (b) the amount of aid, or (c) a determination to make a protective payment.

> The appeal shall be heard *in the county* where the appellant resides. However, if the appellant is outside the state, the Illinois Department, Public Aid Committee, or Commissioner of Appeals, as the case may be, may take depositions from him [or her] and his [or her] witnesses or permit the appellant to present all relevant matter in support of his [or her] claim through witnesses acting in his [or her] behalf, or both by deposition or by testimony of witnesses, depending upon the circumstances in each case.

*Id.* at 706 (emphases in original; citations and internal quotation marks omitted). In concluding that the teleconference hearing contravened the foregoing statutory procedures, the court reasoned as follows:

> The essence of a hearing is the opportunity to be heard by the listener. One can be heard by written affidavit, by closed circuit television, by video tape recording, by telephone or by actual appearance. Each method offers an opportunity to be heard, but only with the last mentioned method is the situs of the hearing—is the place where the listener hears—in the actual presence of the speaker.

> In the instant case, the listener was not one of the local office personnel in Peoria, but the officer or officers located in Chicago. The speakers were the plaintiffs, and under the procedures followed by the IDPA, the plaintiffs were not present at the situs of the hearing. It follows then that the hearing was not conducted in the county of the plaintiffs' residence. We must conclude that the procedures utilized by the IDPA for telephone conference hearings failed to meet statutory requirements of the Public Aid Code.

*Id.* at 707. *See also Padlo v. Illinois Dep't of Public Aid,* 131 Ill.App.3d 430, 86 Ill.Dec. 689, 475 N.E.2d 1068, 1070 (1985) (holding that "an appeal conducted by a teleconference phone call to a hearing officer located in a different county is not conducted 'in person' or 'in the county where the appellant resides' as required by sections 11–8.1 and 11–8.2 of the Illinois Public Aid Code").

In *Detroit Base Coalition for the Human Rights of the Handicapped v. Dep't of Social Services*, 431 Mich. 172, 428 N.W.2d 335 (1988), the Supreme Court of Michigan held that a revised policy [14] of the Department of Social Services that mandated telephone hearings [15] or modified face-to-face hearings [16] for claimants challenging the denial or reduction of public assistance benefits contravened a Michigan rule, Rule 400.907, that required hearings to be conducted at "a reasonable time, date, and place which normally shall be *in the county where a claimant resides.*" *Id.* at 338 (emphasis added). The supreme court held:

> We are persuaded that Rule 400.907 ... contemplates a hearing at which the plaintiffs are present at the place where the decisionmaker is observing, considering, and evaluating the evidence. For purposes of Rule 400.907, we reject defendants' argument that the location of the telephone hearing is in two places simultaneously and hold that the hearing is considered and conducted at the place where the hearing referee is present. Therefore, telephone hearings or the modified face-to-face hearings which are the options available to claimants under the 1984 policy revision do not take place "in the county" in which the claimant resides.

*Id.* at 340.

The reasoning of the Illinois and Michigan courts is persuasive and we similarly hold that the telephone hearing conducted by the AA in this case violated HAR § 17–602.1-13.

In light of this conclusion, it is unnecessary for us to address whether the holding of a telephone hearing constitutes a constitutional due process violation.

### C. *Other Procedural Errors*

HRS § 91–9 (1993), which is part of the Hawaii Administrative Procedure Act that governs contested cases, provides, in relevant part, as follows:

> **Contested cases; notice; hearing; records.** (a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.
>
> (b) The notice shall include a statement of:
>
> ...;
>
> (2) The legal authority under which the hearing is to be held;
>
> ...;
>
> (5) The fact that any party may retain counsel if the party so desires and the fact that an individual may appear on the individual's own behalf[.]

The Muñozes contend that despite their repeated requests, DHS refused to provide them with a copy of the statutes or rules which specified the legal authority under which their hearing was to be conducted by telephone conference. The record indicates that the AA did provide the Muñozes with a copy of HAR chapter 17–602.1, entitled "Hearings," which sets forth the procedures that govern hearings to challenge financial

---

**14.** The Michigan Supreme Court explained that prior to 1980, hearings for claimants "whose benefits had been denied, reduced, or terminated were conducted before a hearing officer at the" Department of Social Services (DSS) office of a claimant's county of residence. Between 1980 and 1984, claimants were given the option of appearing in person at a hearing at a local DSS office or allowing the hearing referee to hear the case by telephone. "In an in-person hearing, the hearing referee traveled to the local office and had an opportunity to view all the witnesses and evidence." *Detroit Base Coalition for the Human Rights of the Handicapped v. Dep't of Social Services*, 431 Mich. 172, 428 N.W.2d 335, 338 (1988). In 1984, the DSS issued Program Policy Bulletin No. 84–16, that allowed for continued use of the telephone hearing procedure, but also allowed for a modified face-to-face hearing procedure. *Id.*

**15.** Under the telephone hearing procedure, "the claimant, any witnesses, and the local DSS worker were in the local office, and the hearing referee was in either the department's Lansing or Detroit office. The hearing was conducted by speakerphones in each office." *Id.*

**16.** Under the modified face-to-face hearing procedure,

> a claimant could travel to one of four hearing sites ... and be present in the same room with the hearing referee, and the department representative would remain in the local office and participate by speakerphone. The case file would remain in the local office.

*Id.*

assistance overpayments. However, as discussed above, these rules did not authorize hearings to be held by telephone conference, except upon agreement of the parties. Therefore, DHS was obviously unable to comply with the Muñozes' request.

■ The Muñozes also complain that they were denied an opportunity to secure legal counsel for the hearing before the AA. The record reflects that DHS's various written notices to the Muñozes properly informed them of their right to obtain legal representation. However, when the Muñozes learned that their hearing would be conducted by telephone conference and sought a continuance to obtain legal counsel, the AA wrongly informed them that the hearing was "not a criminal matter for which legal counsel is required."

Based on the discussion above, we vacate the circuit court's judgment and remand this case with instructions that the circuit court remand this case to DHS for a new hearing that complies with applicable statutes and DHS rules. In light of our remand, we address a final issue raised by the briefs of the parties.

### D. *The Muñozes' Right to Damages*

■ The Muñozes appear to admit that they were overpaid AFDC benefits. However, they object to making any repayment to DHS because they claim that DHS's failure to adhere to and follow prescribed rules and regulations cost "many thousands of dollars of government funds," as well as "many hours, months and years in time and energy by the courts, the Attorney General's staff, [DHS's] staff, and [the Muñozes'] time and money." The Muñozes suggest that their costs to challenge DHS's recoupment efforts exceeded the $294.00 DHS is seeking to collect from them and, therefore, any overpayment they must repay should be offset by the amount of costs they incurred.

Since this case involves a secondary administrative appeal governed by HRS chapter 91, however, the remedial relief that can be granted to the Muñozes by the circuit court or this court is limited. Specifically, HRS § 91–14 (1993) provides, in relevant part, as follows:

(g) Upon review of the record *the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced* because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphasis added.) Pursuant to the above language, there is no authority vested in the hearing officer, the circuit court, or this court to award damages to the Muñozes for costs they incurred as a result of DHS's request to be repaid the amount the Muñozes had been overpaid in AFDC benefits. *In accord: Department of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 771 A.2d 1051, 1060 (2001) (holding that Md.Code (1984, 1999 Repl.Vol.) § 10–222, which is almost identical in language to HRS § 91–14(g), "empowers the reviewing court to remand the case for further proceedings, affirm the decision, or reverse or modify it; there is no provision for the reviewing court to award attorneys' fees").

Accordingly, the Muñozes are not entitled in this proceeding to be compensated for their costs in defending against DHS's efforts to recoup the $294.00 amount allegedly overpaid to them. On remand, therefore, the only issue before the AA shall be the amount of the overpayment, if any, that the Muñozes are required to repay to DHS.